**NORTHERN STATES POWER COMPANY, Appellee,**

v.

**The STATE OF MINNESOTA, the Minnesota Pollution Control Agency, et al., Appellants.**

No. 71–1093.

United States Court of Appeals, Eighth Circuit.

Sept. 7, 1971.

Van Oosterhout, Circuit Judge, dissented and filed an opinion.

G. Robert Johnson, Sp. Asst. Atty. Gen., Warren Spannaus, Atty. Gen. of Minnesota, George Reilly, Chief Deputy Atty. Gen., Minneapolis, Minn., for appellants.

Edward J. Schwartzbauer, Dorsey, Marquart, Windhorst, West & Halladay, William J. Hempel, and Donald E. Nelson, Minneapolis, Minn., for appellee.

Francis B. Burch, Atty. Gen. of Maryland, Thomas M. Downs, Asst. Atty. Gen., Annapolis, Md., for State of Maryland, amici curiae.

James M. Jeffords, Atty. Gen. of Vermont, Montpelier, Vt., amicus curiae of State of Vermont in opposition to granting relief requested in appellee's complaint.

Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Jerome Maslowski, Francis J. Carrier, Asst. Attys. Gen., Lansing, Mich., amici curiae of Michigan Department of Natural Resources and Michigan Department of Public Health.

Before MATTHES, Chief Judge, and VAN OOSTERHOUT and BRIGHT, Circuit Judges.

MATTHES, Chief Judge.

The central question posed by this litigation is whether the United States Government has the sole authority under the doctrine of pre-emption to regulate radioactive waste releases from nuclear power plants to the exclusion of the states. The United States District Court for the District of Minnesota answered affirmatively and its decision is here for review. We affirm.

This suit was commenced in August of 1969 by plaintiff-appellee, Northern States Power Company, hereinafter referred to as Northern, against the State of Minnesota, the Minnesota Pollution Control Agency and the Agency director, secretary and members, all hereinafter referred to as Minnesota. Northern sought a judgment declaring Minnesota to be without authority to regulate radioactive waste releases to the environment from Northern's Monticello nuclear power plant.

It was agreed between the parties that no factual issues were in dispute; that the controversy should be decided on the basis of oral and written stipulations and upon the briefs; and that the sole issue to be determined was whether the federal government, through the United States Atomic Energy Commission (hereinafter AEC), had exclusive authority to regulate the radioactive waste releases from nuclear power plants so as to preclude Minnesota from exercising any regulatory authority over the release of such discharges from the Monticello plant. On December 22, 1970, Chief Judge Devitt filed a memorandum opinion and declaration favorable to Northern. This decision is reported at 320 F.Supp. 172. This appeal is from the final judgment entered on March 17, 1971.

The relevant facts are: Northern is a Minnesota corporation engaged in the generation, production, transmission, distribution and sale of electric power in the States of Minnesota, North Dakota, South Dakota and also in Wisconsin through a wholly-owned subsidiary. It is undisputed that Northern is engaged in interstate commerce. This action was spawned by the nuclear utilization facility consisting of a nuclear-fueled electric

generating plant located on the banks of the Mississippi River near Monticello, Wright County, Minnesota. Construction of the Monticello plant was authorized by a provisional permit issued June 19, 1967, by the AEC pursuant to Section 104(b) of the Atomic Energy Act of 1954, as amended (42 U.S.C. § 2134(b)), and the regulations contained in 10 C.F.R. Part 50.

Northern applied to the Minnesota Pollution Control Agency for a waste disposal permit for the Monticello plant. It was issued May 20, 1969, subject to specified conditions regulating the level of radioactive liquid and gaseous discharges and requiring monitoring programs for the detection of such releases. The conditions imposed by Minnesota embrace the same area as, but are substantially more stringent than, those imposed by the AEC under the federal law. On January 19, 1971, the AEC issued a provisional operating license to Northern under which Monticello is currently operating. For purposes here pertinent, it is undisputed that Northern is acting in compliance with all federal laws and with the radiation safety requirements of the AEC.

In urging reversal of the district court's judgment, Minnesota asserts that the regulation of radioactive waste releases to the environment is within the State's traditional power under the Tenth Amendment to protect and promote the health, safety and general welfare of its citizens. Minnesota also vigorously maintains that the Atomic Energy Act of 1954, as amended, neither expressly nor impliedly pre-empts the State's authority to regulate radioactive waste releases by nuclear power plants. Finally, Minnesota contends that even if Congress did intend to pre-empt this area of regulation, this would not preclude concomitant regulation by the State. Conversely, in support of the district court's judgment, Northern asserts

that the Act, as amended, together with its legislative history, evince a clear Congressional intent that the AEC have exclusive authority and control over the disputed field of regulation. In support of its position of federal pre-emption, Northern also argues that the development and utilization of nuclear energy is an area demanding uniform policies and controls which can only properly be effectuated on a national scale.

It is appropriate to observe that the question of federal pre-emption of the subject matter involved is one of first impression in the federal appellate courts. We realize too that our decision may affect future relationships between other states and other public utility companies who enter the still evolutionary field of nuclear reactor energy production. The many amici briefs filed in this appeal have not only been helpful in our consideration of this case,[1] but have served as an indicator of the widespread interest generated by this litigation. Finally, we are cognizant that apart from the significant and controlling legal issue, the subject of this appeal is collaterally pervaded by currently compelling controversies concerning the need to supply power to an ever burgeoning population, coupled with the newly recognized importance of maintaining an ecological balance and also with the whole Pandora's box of problems in the area of federal-state relationships and responsibilities.

The doctrine of federal pre-emption has its roots in Article VI, Clause 2 of the United States Constitution, the "Supremacy Clause," which elevates federal law above that of the States. It provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of

---

1. Amici curiae briefs in support of Minnesota have been filed by the Michigan Department of Natural Resources and the Michigan Department of Public Health, the State of Wisconsin, the Wisconsin Society of Professional Engineers, the State of Illinois, the State of Maryland and the State of Vermont.

the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

On the other hand, under the Tenth Amendment to the Constitution "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

■ Thus, in the approach to any inquiry into federal preemption, it must be initially determined that Congressional action establishing federal regulation in a particular field has been undertaken pursuant to one of the powers delegated to the United States by the Constitution. Cf. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 229–230, 67 S.Ct. 1146, 91 L. Ed. 1447 (1947).

Once it is ascertained that the federal government possesses the power to regulate in a given area, the question is whether Congress has exercised its power of legislation in such a manner as to exclude the states from asserting concurrent jurisdiction over the same subject matter.

■ First, as the Supreme Court noted in Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility * * *" See also, Case v. Bowles, 327 U.S. 92, 102–103, 66 S.Ct. 438, 90 L.Ed. 552 (1946); Franklin Nat'l Bank v. New York, 347 U.S. 373, 378–379, 74 S. Ct. 550, 98 L.Ed. 767 (1954); Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 156, 62 S.Ct. 491, 86 L.Ed. 754 (1942).

■ Second, absent inevitable collision between the two schemes of regulation it must be determined whether Congress manifested an intent to displace coincident state regulation in a given area. Where Congress has unequivocally and expressly declared that the authority conferred by it shall be exclusive, then there is no doubt but that states cannot exert concomitant or supplementary regulatory authority over the identical activity. Campbell v. Hussey, 368 U.S. 297, 302, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 235–236, 67 S. Ct. 1146, 91 L.Ed. 1447.

■ Third, even where Congress has not expressly prohibited dual regulation nor unequivocally declared its exclusionary exercise of authority over a particular subject matter, federal pre-emption may be implied. Bethlehem Steel Co. v. New York State Labor Relations Bd., 330 U.S. 767, 772, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947); Napier v. Atlantic Coast Line R.R., 272 U.S. 605, 613, 47 S.Ct. 207, 71 L.Ed. 432 (1926). Key factors in the determination of whether Congress has, by implication, preempted a particular area so as to preclude state attempts at dual regulation include, *inter alia*: (1) the aim and intent of Congress as revealed by the statute itself and its legislative history, Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. at 147–150, 83 S.Ct. 1210; Campbell v. Hussey, supra, 368 U.S. at 301–302, 82 S.Ct. 327; (2) the pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency, Pennsylvania v. Nelson, 350 U.S. 497, 502–504, 76 S.Ct. 477, 100 L.Ed. 640 (1956); Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 230, 67 S.Ct. 1146; Bethlehem Steel Co. v. New York State Labor Relations Bd., supra, 330 U.S. at 774, 67 S.Ct. 1026; (3) the nature of the subject matter regulated and whether it is one which demands "exclusive federal regulation in order to achieve uniformity vital to national interests." Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. at 143–144, 83 S.Ct. at 1218; San Diego Building Trades Council v. Garmon, 359 U.S. 236, 241–244, 79 S.Ct. 773, 3 L.Ed. 2d 775 (1959); Guss v. Utah Labor Relations Board, 353 U.S. 1, 10–11, 77 S.

Ct. 598, 1 L.Ed.2d 601 (1957); Morgan v. Virginia, 328 U.S. 373, 377, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946); and ultimately (4) "whether, under the circumstances of [a] particular case [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See also Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 380–381, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); Nash v. Florida Industrial Comm'n., 389 U.S. 235, 240, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967); Hill v. Florida ex rel. Watson, 325 U.S. 538, 542, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945); Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182 (1912).

Guided by the foregoing basic principles, we turn to the merits of the preemption question presented by this appeal.

At the outset, we observe that there can be no doubt but that Congress was acting within its constitutionally delegated authority in establishing a system of regulation over the entire spectrum of atomic energy, including the imposition of federal controls over health and safety standards. Congressional findings concerning the development, use and control of atomic energy demonstrate reliance upon the constitutionally granted powers over the common defense and security, interstate and foreign commerce and promotion of the general welfare. 42 U.S.C. §§ 2011, 2012.[2]

Next, no physical impossibility of dual compliance with both the AEC and Minnesota regulations governing radioactive discharges from the Monticello plant is presented on this record. Rather, as ac-knowledged by the parties in the district court, the Minnesota pollution control requirements cover the same area as, but are substantially more stringent than, the federal regulations. Also, as the parties concede, and as an examination of the legislation in question reveals, no provision of the Atomic Energy Act expressly declares that the federal government shall have the sole and exclusive authority to regulate radiation emissions from nuclear power plants.

Under these circumstances, then, it is necessary to determine whether Congress has nevertheless manifested an intent to displace concurrent state regulation in this field.

We begin with an examination of the statute in question, its development, legislative history and administrative interpretation. Atomic energy first became the subject of federal legislation with the enactment of the Atomic Energy Act of 1946, Ch. 724, 60 Stat. 755. The paramount concern of Congress was the assurance of the common defense and security in the development and utilization of nuclear power, since the principal use of atomic energy at that time was for military purposes. Consistent with this primary objective, the organic Act created a government monopoly for the production and use of fissionable material. Control over these aspects of nuclear energy was vested in the Atomic Energy Commission which was established by the Act. Ownership of all nuclear production facilities and of all fissionable material was placed in the Commission as agent for the United States.

Technical and scientific advances in the development of atomic energy for peaceful purposes were accomplished at a more accelerated pace than had been anticipated. Prompted by these achievements, Congress, by 1954, recognized the need to revise the 1946 Act "to take ac-

---

2. For a detailed analysis of the constitutional bases for the Congressional exercise of regulatory control over public health and safety standards as they relate to atomic energy, see Estep & Adleman, State Control of Radiation Hazards: An Intergovernmental Relations Problem, 60 Mich.L.Rev. 41 (1961); Estep, Federal Control of Health and Safety Standards in Peacetime Private Atomic Energy Activities, 52 Mich.L.Rev. 333 (1954).

count of existing realities in atomic energy, in our Nation and throughout the world." S.Rep. No. 1699, 83rd Cong. 2d Sess., reproduced in 1954 U.S.Code Cong. & Admn.News, pp. 3456, 3457. Thus, in 1954 the Act was amended for the purpose of encouraging private enterprise in the development and utilization of atomic energy for peaceful purposes.

In accordance with this objective, the amended Act allowed ownership of nuclear production and utilization facilities by persons who obtained a license from the Commission. Otherwise, exclusive ownership of such facilities remained in the Commission. 42 U.S.C. §§ 2061, 2134.[3] Similarly, the 1954 amendment authorized private ownership of by-product material and the leasing of special nuclear material, but only by those licensed by the Commission. 42 U.S.C. § 2111.[4]

Thus, while the 1954 amendments allowed forfeiture of monopolistic government control over the development and utilization of atomic energy, exclusive government ownership rights and control could be surrendered only through compliance with the AEC licensing scheme which the new legislation directed. Federal regulation over the processing and use of source, by-product and special nuclear material and over production and utilization facilities was insured in the 1954 amendments by means of this comprehensive licensing system required by the Act.[5] Moreover, the importance with which Congress viewed the maintenance of a federal system of regulation and control in this area is revealed in its findings, which are replete with policy statements concerning the need for regulation in the

national interest in order to provide for the common defense and security and to protect the health and safety of the public. 42 U.S.C. § 2012.

In 1959, Congress further amended the Atomic Energy Act by adding a new section. 42 U.S.C. § 2021. The purpose of the new section is set out in subsection (a) which expresses the intent of Congress to clarify the respective responsibilities of the states and the AEC with respect to control of by-product, source, and special nuclear materials; to establish programs for cooperation and an orderly regulatory pattern between the states and the AEC with regard to regulation of radiation hazards associated with the use of these materials; and to establish procedures "for discontinuance of certain of the Commission's regulatory responsibilities with respect to by-product, source, and special nuclear materials, and the assumption thereof by the States."

In subsection (b), the principal substantive portion of the new section, Congress authorizes the AEC to discontinue its regulatory authority, including control over radiation hazards, with regard to by-product, source and special nuclear material in quantities not sufficient to form a critical mass. Discontinuance of AEC regulation in these areas is accomplished only when the Governor of a state and the AEC enter into an agreement to that effect. It is important to note, however, as Minnesota concedes, that radioactive discharges from nuclear power plants does not fall within any of the three categories enumerated in § 2021(b) over which AEC authority may be relinquished by means of such turnover agreements. Moreover, it is undisputed on this record that Minnesota has

---

3. The Act as amended also allows private ownership of production facilities useful in the conduct of research which do not have the capacity for production of a sufficient quantity of nuclear material to produce an atomic weapon. 42 U.S.C. § 2061.

4. In 1964, the Act was further amended to allow private ownership of special nuclear material by AEC licensees. Pub.L. 88–

489, §§ 5–8, 78 Stat. 603, 604; 42 U.S.C. § 2073.

5. An analysis of the step-by-step procedure for the licensing of a nuclear power plant by the AEC is set out in Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 404–409, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

not entered into a turn-over agreement with the AEC.

We are more concerned here with subsection (c) of § 2021 which *prohibits* the AEC from discontinuing its authority and responsibility with respect to the regulation of certain specified activities including "the construction and operation of any production or utilization facility," which would include the discharge of radioactive effluents from the facility or plant.[6] However, Minnesota interprets this subsection only as prohibiting *total* relinquishment by the federal government over nuclear power plants, but does not view the concurrent exercise of state control over nuclear facilities as being forbidden by the Act.

We cannot agree with Minnesota's position that dual control over atomic power plants and the level of effluents discharged therefrom is permissible under the Act. While the 1959 amendment does not use the terms "exclusive" or "sole" in describing existing regulatory responsibilities of the Commission, we think it abundantly clear that the whole tone of the 1959 amendment, upon examination of the statutory language alone, demonstrates Congressional recognition that the AEC at that time possessed the sole authority to regulate radiation hazards associated with by-product, source, and special nuclear materials and with production and utilization facilities. Of particular importance in demonstrating

this assumption is the language in subsection (b) which provides that *"[d]uring the duration of such an agreement* it is *recognized* that the State shall have authority to regulate the materials *covered by the agreement* for the protection of the public health and safety from radiation hazards." (Emphasis supplied.) Manifestly, if the states at that time possessed concurrent jurisdiction to regulate radiation hazards associated with these materials, it would have been unnecessary for Congress affirmatively to recognize their regulatory authority by virtue of a state-federal compact and to limit their authority for the duration of and subject to the provisions of such agreement. Secondly, the language of § 2021 repeatedly refers to a "discontinuance" of the Commission's regulatory authority or to the "retention" or "continuation" of authority in some areas.

Also, § 2021(k) provides that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities *for purposes other than protection against radiation hazards."* (Emphasis supplied.) .

In our view, this provision further illustrates Congressional recognition and intention that the states possess no authority to regulate radiation hazards unless pursuant to the execution of an agreement surrendering federal control over the three categories authorized un-

6. There can be no doubt but that AEC control over "the construction and operation of any production or utilization facility" necessarily includes control over radioactive effluents discharged from the plant incident to its operation. In analyzing § 2021(c) (1) in the Hearings before the Joint Committee on Atomic Energy, Mr. Lowenstein of the AEC at p. 306 explained:

"The activities covered under this provision (i) include but are not limited to the possession and storage at the site of the licensed activity of nuclear fuel, and of source special nuclear material and byproduct materials used or produced in the operation of the facility; and the transportation of nuclear fuels to and from the reactor site and the discharge of effluent from the facility.

"Coming to the question you asked before, Mr. Ramey [Executive Director, Joint Committee], the purpose of this provision is to retain under Commission regulatory control the operation of the reactor. We did not feel that we could begin to cut up that into pieces, so to speak. The discharge of effluent from the reactor involve many questions relating to the design and construction and operating procedures. We did not think it could be considered by itself and broken away from overall responsibility for the reactor operation."

Moreover, the agreed statement of facts submitted in the district court included, the stipulation that "[w]aste disposal requirements affect the design, manufacture, cost and sale of nuclear reactor plants and associated equipment."

der § 2021(b). The only logically acceptable reason for inclusion of subsection (k) within § 2021 was to make it clear that Congress was not, by subsection (c) of the 1959 amendment, in any way further limiting the power of the states to regulate activities, *other than radiation hazards,* associated with those areas over which the AEC was forbidden by that subsection to relinquish its control. Unless the federal government possessed exclusive authority over radiation hazards, the inclusion of the italicized portion of subsection (k) quoted above would have been meaningless and unnecessary.

In addition, the implicit Congressional recognition of the existing exclusiveness of federal authority over regulation of radiation hazards which the 1959 amendment reflects is consistent with the previous legislation. As noted, under the organic law, the 1946 Act, complete government ownership and control was established. The sole purpose of the 1954 amendments was to relinquish or forfeit ownership and production rights to private enterprise where certain conditions were met. No provision for a concomitant surrender of control over regulation of radiation hazards to the states was included. To the contrary, forfeiture of exclusive ownership and production rights was subject to compliance with federal controls over radiation hazards, which the 1954 Act required the AEC to establish and enforce.

Finally, we are of the firm opinion that the mere enactment of elaborate and detailed legislation authorizing turnover agreements to effect a cession to the states of regulatory authority over some activities associated with radiation hazards, and specifically prohibiting the relinquishment of authority over others, in itself evinces an inescapable implication that the federal government possessed exclusive authority absent the agreements authorized by the 1959 amendment. Guss v. Utah Labor Relations Board, supra, 353 U.S. at 10, 77 S.Ct. 598, 1 L.Ed.2d 601.

Despite our strong belief that § 2021 makes it abundantly clear that Congress intended federal occupancy of regulations over all radiation hazards except where jurisdiction was expressly ceded to the states, if any doubt remains, it is affirmatively resolved by the wealth of legislative history accompanying the 1959 amendment.

Prior to passage of the amendment, extensive hearings were conducted from May 19, to May 22, 1959, before the Joint Committee on Atomic Energy which was composed of distinguished Senators and Representatives. The testimony and statements of nearly fifty experts in the fields of atomic energy, public health and atomic law were heard.

Many of those appearing before the committee addressed themselves to the question of federal-state jurisdiction with regard to the regulation of radiation hazards from nuclear reactors. See, e. g., statements of: Lee M. Hydeman, Codirector of the Atomic Energy Research Project at the University of Michigan Law School, Hearings before the Joint Committee on Atomic Energy, 86th Cong., 1st Sess., pp. 127, 130; John S. Graham, Commissioner of the AEC, Hearings, supra at pp. 290–91; Robert Lowenstein, Office of the General Counsel of the AEC, Hearings, supra at p. 307; Hon. Jo M. Ferguson, Attorney General of Kentucky, Hearings, supra at p. 324.

Subsequent to the hearings conducted in May 1959, an Executive order which established the Federal Radiation Council and reaffirmed the administration's support of the proposed amendment to the 1954 Act was issued. Identical Senate and House bills were introduced in late August 1959 and the Joint Committee voted to report the bills out with certain minor committee amendments. The Senate bill was passed in lieu of the House bill, and Senate Report No. 870 explains the purposes of the bill and

gives a section-by-section analysis of its provisions.[7]

This unanimous committee report makes it clear that Congress intended to pre-empt the field of the licensing and regulation of nuclear reactors to the exclusion of the states and that it did not intend to provide for dual regulation of radiation hazards, even as to those activities which could be turned over to the states.

Relevant portions of the Comments by the Joint Committee include:

"(b) The bill applies to some, but not all, atomic energy activities now regulated exclusively by AEC. It applies principally to radioisotopes, whose use and present licensing by AEC is widespread, but whose hazard is local and limited. Moreover, the radiation hazard from radioisotopes has similarities to that from other radiation sources already regulated by States—such as X-ray machines and radium. *Licensing and regulation of more dangerous activities—such as nuclear reactors—will remain the exclusive responsibility of the Commission.* Thus a line is drawn between types of activities deemed appropriate for regulation by individual States at this time, and other activities where continued AEC regulation is necessary." (Emphasis supplied.)

\* \* \* \* \* \*

"3. *It is not intended to leave any room for the exercise of dual or concurrent jurisdiction by States to control radiation hazards by regulating*

7. Senate Report No. 870 is reproduced in 1959 U.S.Code Cong. & Adm.News, p. 2872.

8. In 1957 the AEC submitted proposed legislation to the Joint Committee on Atomic Energy which would have provided for the exercise of dual or concurrent jurisdiction by both the AEC and the States over activities licensed by the Commission, and would have allowed the States to adopt and enforce radiation standards for the protection of the public health and safety in areas regulated by the AEC. The allowance of dual jurisdiction

*byproduct, source, or special nuclear materials.* The intent is to have the material regulated and licensed either by the Commission, or by the State and local governments, but not by both. The bill is intended to encourage States to increase their knowledge and capacities, and to enter into agreements to assume regulatory responsibilities over such materials." (Emphasis supplied.)[8]

More particularly, in the section-by-section analysis of the bill, the report states:

"Subsection c. of the bill excludes certain areas from an agreement under subsection b. between the Commission and the Governor of a State. These are areas which, because of their special hazards, or for reasons of Federal responsibility, are believed desirable for continued responsibility by the Commission. They include the construction and operation of production or utilization facilities, including reactors; \* \* \*"

\* \* \* \* \* \*

"*Subsection k. provides that nothing in the new section 274 shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards.* This subsection is intended to make it clear that the bill does not impair the State authority to regulate activities of AEC licensees for the manifold health, safety, and economic purposes other than radiation protection. As indicat-

was abandoned by the AEC in the 1959 proposed bill submitted by it to the Joint Committee. (See Statement of John S. Graham, Commissioner, U.S. Atomic Energy Commission, Hearings Before the Joint Committee on Atomic Energy, 86th Cong., 1st Sess. pp. 27, 290). The rejection of this first proposal is a circumstance which may be considered in ascertaining the intent of Congress in the 1959 legislation. Fox v. Standard Oil Co., 294 U.S. 87, 96, 55 S.Ct. 333, 79 L.Ed. 780 (1935) ; Fleming v. Hawkeye Pearl Button Co., 113 F.2d 52, 58 (8th Cir. 1940).

ed elsewhere, the Commission has exclusive authority to regulate for protection against radiation hazards until such time as the State enters into an agreement with the Commission to assume such responsibility." (Emphasis supplied.)

The value of the Joint Committee report as an explicit manifestation of the intent of Congress that the federal government retain exclusive control over the construction and operation of nuclear reactors cannot be disputed. See Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); United States v. O'Brien, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Hudson Distributors, Inc. v. Eli Lilly & Co., 377 U.S. 386, 390–392, 84 S.Ct. 1273, 12 L. Ed.2d 394 (1964).[9] And the view expressed in this report, of course, takes precedence over any conflicting expressions of opinion in the hearings or debates. Zuber v. Allen, supra, 396 U.S. at 186, 90 S.Ct. 314; Banco Nacional de Cuba v. Farr, 383 F.2d 166, 175 (2d Cir. 1967), cert. denied 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968); American Airlines, Inc. v. CAB, 125 U.S.App. D.C. 6, 365 F.2d 939, 948–949 (1966). Cf. United States v. O'Brien, supra, 391 U.S. at 385, 88 S.Ct. 1673. Moreover, the intent of Congress clearly spelled out in the committee report takes on even more significance in light of the fact that this expression of pre-emption was consistent with the intention of the sponsor of the legislation, the AEC. National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); NLRB v. Fruit & Vegetable Packers, Local 760, 377 U.

S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964).[10]

As a final aid in construing the Atomic Energy Act, as amended, so as to ascertain the presence or absence of Congressional intention to pre-empt the field of regulation in question, we deem it appropriate to accord respectful consideration to the AEC's construction of the statute. Zuber v. Allen, supra, 396 U.S. at 192, 90 S.Ct. 314, 24 L.Ed.2d 345; Power Reactor Dev. Co. v. International Union of Elec., etc. Workers, AFL–CIO, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). The AEC has enacted into its regulations an interpretation of the Atomic Energy Act, as amended, by the General Counsel of the Commission. 10 C.F.R. § 8.4. In unequivocal terms, this regulation provides that the states lack authority to regulate nuclear power plants and the discharge of effluents from these facilities from the standpoint of radiological safety and health. This interpretation is premised upon the finding that the Atomic Energy Act of 1954 and as amended in 1959 had the effect of pre-empting this field of regulation to the federal government.

While the Act, as amended, and its legislative history, when viewed together, provide the strongest manifestation of Congressional intent to pre-empt the field of regulation over the construction and operation of nuclear reactors, we also find further evidence of an implied Congressional intention to pre-empt this area by the pervasiveness of the federal regulatory scheme which Congress directed and which the AEC has carried into effect through the promulgation and enforcement of detailed regulations

9. In determining whether Congress intended federal pre-emption over a field of regulation, the Supreme Court has frequently relied upon the legislative history of the act in question. See, e. g. Brotherhood of Locomotive Eng'rs. v. Chicago, R. I. Pac. R. R., 382 U.S. 423, 434–37, 86 S.Ct. 594, 15 L.Ed.2d 501 (1966); Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. at 149–150, 83 S.Ct. 1210, 10 L.Ed.2d 248; Camp-

bell v. Hussey, supra, 368 U.S. at 301, 82 S.Ct. 327, 7 L.Ed.2d 299.

10. The hearings before the Joint Committee reflect that the AEC consistently maintained that the federal government had pre-empted the field regarding licensing and regulation of nuclear power reactors. See, e. g. testimony of Mr. Lowenstein, Staff Counsel for the AEC.

governing the licensing of atomic power plants. In what is perhaps the most comprehensive treatise on atomic law, Stason, Estep & Pierce, Atoms and the Law (1954), the authors commented:

"The federal licensing scheme to control the development and utilization of atomic energy, as established by Congress and implemented by the AEC, is extraordinarily pervasive, probably more pervasive than any regulatory scheme considered by the Supreme Court in analogous [pre-emption] cases discussed above. Furthermore, the Commission's licensing system is but a part of an intensive program to promote the public and private development and utilization of atomic energy."

Id. at 1059.

As also noted by the authors of this treatise, it is significant that the pervasiveness of the federal regulatory scheme was subsequently even broadened by Congress in the enactment of Pub.L. 85–256, § 5, 85th Cong., 1st Sess., now 42 U.S.C. § 2039 which gives statutory standing to the Advisory Committee on Reactor Safeguards. Moreover, the breadth of the federal program is amply demonstrated by the comprehensive licensing requirements enacted and enforced by the AEC and published in Title 10 of the Code of Federal Regulations.

The nature of the subject matter regulated and the need for uniform controls in order to effectuate the objectives of Congress are additionally supportive of a finding of pre-emption. In enacting the Atomic Energy Act of 1954, Congress made specific findings concerning the development, use and control of atomic energy. Included in these findings are a number of statements to the effect that the processing and utilization of source, by-product and special nuclear material *must be regulated by the United States in the national interest* because of their affect upon interstate and foreign commerce and in order to provide for the common defense and securi-ty and to protect the health and safety of the public.

However, Minnesota vigorously maintains that the subject matter regulated in the instant case is confined to the narrow area of pollution control over the radioactive effluents discharged from the Monticello plant and that this is peculiarly related to the public health and safety of its state's citizens and therefore within their police powers to control. See Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L. Ed.2d 852 (1960). They contend that this is not an area which by its very nature admits only of national supervision nor one demanding exclusive federal regulation in order to achieve uniformity vital to national interests. Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. at 143–44, 83 S.Ct. 1210, 10 L.Ed.2d 248.

We cannot acquiesce in this microcosmic approach to the subject matter to be regulated. As discussed earlier, regulation of the radioactive effluents discharged from a nuclear power plant is inextricably intertwined with the planning, construction and entire operation of the facility. See fn. 6, supra. As Northern points out and as the record reveals, major generating plants not only produce electric power for customers in their own and neighboring states, but are part of an interstate transmission system which makes possible the purchase and sale of electric power between major systems across the nation. Congressional objectives expressed in the 1954 Act evince a legislative design to foster and encourage the development, use and control of atomic energy so as to make the maximum contribution to the general welfare and to increase the standard of living. 42 U.S.C. §§ 2011, 2012. However, these objectives were to be effectuated "to the maximum extent consistent with the common defense and security and with the health and safety of the public." 42 U.S.C. § 2013. Thus, through direction of the licensing scheme for nuclear reactors, Congress vested the AEC with the authority to re-

solve the proper balance between desired industrial progress and adequate health and safety standards. Only through the application and enforcement of uniform standards promulgated by a national agency will these dual objectives be assured. Were the states allowed to impose stricter standards on the level of radioactive waste releases discharged from nuclear power plants, they might conceivably be so overprotective in the area of health and safety as to unnecessarily stultify the industrial development and use of atomic energy for the production of electric power.

As one author cogently observed:

"The foregoing is thought to demonstrate that independent state licensing would retard the effectiveness of AEC in meeting its responsibilities under the Atomic Energy Act. Where the AEC finds itself limited by lack of resources or manpower, independent state licensing authorities would be less well equipped. AEC-manufacturer-utility cooperative efforts at design improvements and at standardization would be hampered by the existence of dual regulation. The public would likely see and understand less of the complexities of a reactor safety program· as a result of variegated proceedings. Proprietary information might be compromised, and the cost of the licensing process might reach such proportions as to retard the development of this major new resource."

Helman, "Pre-emption: Approaching Federal-State Conflict over Licensing Nuclear Power Plants," 51 Marq.L.Rev. 43, 67 (1967). See also Cavers, "State Responsibility in the Regulation of Atomic Reactors," 50 Ky.L.J. 29, 34 (1961); Neel, "Federal or State Jurisdiction over Atomic Products and Waste—A Dilemma," 50 Ky.L.J. 52, 57 (1961); Estep & Adelman, "State Control of Radiation Hazards: An Intergovernmental Relations Problem," 60 Mich. L.Rev. 43, 44 (1961); Stason, Estep & Pierce, Atoms and the Law, 1062–68 (1954); Hearings before the Joint Committee on Atomic Energy, 86th Cong.,

1st Sess. (1959) at 126, 302, 315. In short, a dual system of licensing and regulation with control exerted by both the states and the federal government over the level of radioactive effluents discharged from nuclear power plants would create "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, supra, 312 U.S. at 67, 61 S.Ct. at 404, 85 L.Ed. 581. Compare First Iowa Hydro-Elec. Coop. v. FPC, 328 U.S. 152, 167–182, 66 S.Ct. 906, 90 L.Ed. 1143 (1946).

Accordingly, for the reasons stated, we hold that the federal government has exclusive authority under the doctrine of pre-emption to regulate the construction and operation of nuclear power plants, which necessarily includes regulation of the levels of radioactive effluents discharged from the plant.

Finally, in affirming the judgment we deem it appropriate to comment upon the excellence and expertise with which Chief Judge Devitt handled this matter, as is demonstrated by his exhaustive and soundly reasoned opinion.

VAN OOSTERHOUT, Circuit Judge (dissenting).

I regret that I am unable to agree with the conclusion reached in the majority opinion. I would reverse.

Chief Judge Matthes in the majority opinion has fairly stated the facts and the issues. I agree that Congress has power to preempt the field here involved and that it has in fact preempted absolute control of licensing nuclear power for civilian use. The licensing power carries with it the right to impose conditions on the private use of nuclear energy. The minimum standards imposed by the government must be met and cannot be lowered by a state or an agency thereof. The standards imposed by the State of Minnesota upon Northern States Power Company in the interest of preventing pollution of its air, water and land are more restrictive than those imposed by the AEC.

Highly important first impression issues of environment control and state and federal relations are presented by this appeal.

The standards to be followed in determining whether federal preemption exists are thus stated in Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248:

"The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

"The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, e. g., Huron Portland Cement Co. v. Detroit, *supra*."

The tests there stated are the appropriate tests to be applied in our present situation. We all agree that it is possible for Northern to comply with both the state and federal regulations, and hence preemption is not established by the first test. Our point of difference is on the issue of whether Congress has "unmistakably" expressed an intent to preempt the field. The Supreme Court has uniformly recognized the legitimate interest of the state in its laws designed to protect the health and safety of its citizens and has refused to find federal preemption over state health and safety laws, absent a clear and unmistakable showing of an intent on the part of Congress to preempt. Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pacific Railroad Co., 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501 (reversing 239 F.Supp. 1); Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852; Terminal Railroad Ass'n of St. Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571; Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108.

In cases not involving public health and safety, preemption is much more readily inferred. Local 24 International Brotherhood of Teamsters v. Oliver, 358 U.S. 283, 297, 79 S.Ct. 297, 3 L.Ed.2d 312; California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034.

The state laws here relevant clearly fall in the category of laws designed to protect the health and safety of Minnesota citizens.

We are in agreement that the Atomic Energy Act as amended contains no express provision that the federal government shall have sole and exclusive authority to regulate radiation emissions from nuclear power plants. The failure of the statute to expressly preempt the field is not an oversight. Highly pertinent legislative history is set forth in Note "Jurisdiction—Atomic Energy", 68 Mich.L.Rev. 1294, 1303-1304,[1] as follows:

"During the hearings on the amendment held by the Joint Committee on Atomic Energy, the lack of an explicit delineation of federal and state responsibilities regarding the operation of nuclear reactors was discussed. In fact, the same Minnesota regulations that are the subject of the current controversy between that state and the AEC led Mr. Toll, counsel to the committee, to suggest the need for further clarification:

Mr. Toll * * * [O]n the question of reactors does this bill go far enough? Should there be a statement that these activities are expressly preemptive to the federal government?

1. See 1959 Hearings 307.

Mr. Lowenstein. [Office of the General Counsel, AEC] Under this bill which gives explicit reference to the interest of the Federal and State Governments, we think it would be fairly apparent, as many of us now believe under the existing Atomic Energy Act, that there has been an area of preemption. We considered the desirability of writing the kind of provision you suggested, Mr. Toll, and we decided against it primarily for the reason that it is practically impossible to try to define, taking into account all of the various gray areas and special circumstances that might arise, where these areas of preemption begin and end.

Mr. Toll. Does this bill do anything to clarify the situation as to the Minnesota regulations * * *? Minnesota has no indication from the Federal Government as to whether or not the State of Minnesota has legal authority to license reactors.

Mr. Lowenstein. In this bill, we are not trying to deal with any specific situation.

Mr. Toll. Minnesota is just an example of the first State that has attempted to license reactors. Should this bill attempt to spell out whether or not they are encouraged or whether they have legal authority to do this?

Mr. Lowenstein. I think this is a suggestion that is certainly worth giving consideration to. The problem, I think, that you run into is that when you begin to specify one thing such as licensing, then you create questions and perhaps leave inferences as to what the State's authority might be in other details.

"Mr. Toll then suggested that the Act should be reworded in order to make explicit Congress' intent to preempt state control of nuclear reactors; but Mr. Lowenstein, expressing the AEC position, stated a preference for leaving the question to the court:

Mr. Lowenstein. We thought that this act, without saying in so many words did make clear that there was preemption here, but we have tried to avoid defining the precise extent of that preemption, feeling that it is better to leave these kind of detailed questions perhaps up to the courts later to be resolved.

"Representative Durham voiced some objection to the AEC position:

Representative Durham. I don't agree in writing an act like that. I think it should be clearly defined what is our field and what is their field.

Mr. Lowenstein. I think this does do that, Mr. Durham.

Representative Durham. I think so, too. If they want to set up a licensing system, they can do it. The courts will decide it, then, not us. I think the law should be as clear as possible to avoid litigation. I am not a lawyer, but I wonder if that is not a pretty clear statement of what we intended to do, and what we are writing into the Act."

It would appear that the General Counsel for AEC on behalf of AEC expressed the view that the Commission was uncertain how far it wanted to go on preemption and that the Commission did not favor defining the precise area or extent of preemption.

Congress knew how to establish federal preemption by expressly providing therefore in clear language. No such language was incorporated in the Act. A similar situation existed in Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pacific Railroad Co., supra, where the Supreme Court reversed a three-judge determination that Congress had preempted the field covered by the full-crew laws.

The Atomic Energy Act as amended as a whole reflects no clear intent to preempt the field involved in this appeal. Section 274(b) (42 U.S.C.A. §

2021) expresses a willingness to transfer some types of regulation to the states. Section 274(c), which appears to be the most pertinent to radiation control of nuclear power, reads:

"(c) No agreement entered into pursuant to subsection (b) of this section shall provide for discontinuance of any authority and the Commission shall retain authority and responsibility with respect to regulation of—

(1) the construction and operation of any production or utilization facility; * * *."

Section 274(k) reads:

"Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards."

The foregoing statutes establish the responsibility on the AEC to regulate permissible radiation of nuclear plants. They do not state that such power is exclusive. It would appear to be entirely reasonable for Congress to place on the AEC as licensor the responsibility for making certain protection would be afforded the public from radiation hazards. There is nothing in the statutes which expresses a clear Congressional intent to prohibit the states from taking additional reasonable steps deemed necessary to control air, water and land pollution whether the pollution be by radiation or otherwise. As pointed out by the majority opinion, language can be found in the legislative history to support a contrary view. The language of a statute controls over the legislative history, which is often ambiguous. Congress was aware of the problem and could have solved it readily by incorporating appropriate language in the Act. It refused to do so.

Pollution of land, water and air by nuclear power plants may be brought about by other means than radiation. Close factual issues may arise whether pollution is caused by radiation or by other pollutants. Control of pollution not caused by radiation is expressly reserved to the states. Thus the control of various sources of pollution is divided and hence complete unification of pollution caused by nuclear plants is not possible.

The AEC prior to the adoption of the National Environmental Policy Act of 1969, 42 U.S.C.A. § 4321 (NEPA) consistently held that its obligations were limited to radiation hazards and that it could not consider broader environmental impacts. State of New Hampshire v. Atomic Energy Commission, 1 Cir., 406 F.2d 170; Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, D.C. Cir., 449 F.2d 1109 (July 23, 1971).

Congress since the passage of the Atomic Energy Act and amendments thereto manifested a clear interest in protecting our natural environments and in furtherance thereof has enacted the Environmental Education Act, 20 U.S.C.A. § 1531; Air Quality Act of 1967, 42 U.S.C.A. § 1857; Environmental Quality Improvement Act of 1970, 42 U.S.C.A. §§ 4372–4374; Water and Environmental Quality Improvement Act of 1970, Pub.L. 91–224, 91st Cong., 2d Sess. (1970).

A good discussion of these acts is found in *Calvert Cliffs'* supra. The environmental control acts recognize a significant state interest in protecting environment. Calvert Cliffs' points out that AEC rules adopted subsequent to NEPA require that a condition be added to all nuclear construction permits which would obligate the holders of the permits to observe all applicable environmental standards imposed by federal or state law.[2]

The majority opinion also observes that states might adopt overprotective environmental control regulations which would go to the extent of stultifying the industrial development and use of atomic

---

**2.** The court in *Calvert Cliffs'* determines that the AEC in respects set out has failed to fully comply with the requirements of NEPA.

**1158**

energy. I agree that such a possibility exists. However, in our present case the trial court decided the case on the basis of absolute preemption as a matter of law and refused to permit testimony on the reasonableness of the state regulations or the balancing of environmental protection against the desired development of the use of atomic energy. The court made no findings upon such issue. The issue of the reasonableness of the state regulations and of whether they were so burdensome as to frustrate the development of atomic energy is not properly before us.

I would reverse the judgment of dismissal.