**COLORADO PUBLIC INTEREST RESEARCH GROUP, INC., a non-profit Colorado corporation, et al., Plaintiffs,**

**v.**

**Russell TRAIN as Administrator, United States Environmental Protection Agency, 401 M. St., S.W., Washington, D.C. and United States Environmental Protection Agency, 401 M. St., S.W., Washington, D.C., Defendants.**

**Civ. A. No. C–5438.**

United States District Court,
D. Colorado.
Feb. 15, 1974.

David C. Mastbaum, David E. Engdahl, Boulder, Colo., James L. Phelan, Denver, Colo., for plaintiffs.

William K. Hickey, Asst. U. S. Atty., Denver, Colo., and Michael D. Graves, Trial Atty., Dept. of Justice, Washington, D. C., for defendants.

### MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT

WINNER, District Judge.

The case is before the Court on cross-motions for summary judgment, and the parties agree that there are no genuine issues of material fact. The case involves plaintiff's challenge of the accord worked out between and followed by the Atomic Energy Commission and the Environmental Protection Agency as to the correlation of the Federal Water Pollution Control Act and the Atomic Energy Act. Plaintiffs want the EPA to regulate the discharge of "byproduct materials," "source materials" and "special nuclear materials" from the Ft. St. Vrain Generating Facility, a privately owned nuclear electrical generating plant, and from the Rocky Flats Plant, a federally owned plant. The EPA and the AEC think that the regulation of the discharge of these particular materials is under the exclusive jurisdiction of the AEC and that such regulation is not under either the exclusive or the concurrent jurisdiction of the EPA. The Public Service Company of Colorado, the owner of the Ft. St. Vrain facility, has not been named as a defendant. Defendants have not raised the indispensable party question, and no ruling is made on it. Certainly the problem exists.

As phrased by plaintiffs in their brief, "The only issue before the Court is whether all radioactive effluents are subject to regulation pursuant to the 1972 Amendments to the Federal Water Pollution Control Act. 33 U.S.C. § 1251, et seq. . . . Simply stated, it is our position that this administrative decision [to leave the regulation of such effluents to the AEC] is totally contrary to the clear and unambiguous language of the 1972 Amendments to the Federal Water Pollution Control Act."

Defendants concede that the Federal Water Pollution Control Act gives the EPA power to regulate the discharge of "pollutants" and that some radioactive materials are indeed pollutants. But, say defendants, "byproduct," "source" and "special nuclear materials" must be treated differently, and, defendants have concluded that, reading the two Acts together, the regulation of discharges of those materials is for the AEC alone.

Necessarily, then, the starting place is a definition of the critical terms, and they are defined by statute:

42 U.S.C. § 2014(e) defines *"byproduct material"* as "any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material."

42 U.S.C. § 2014(z) defines *"source material"* as "(1) uranium, thorium, or any other material *which is determined by the Commission* pursuant to the provisions of section [61] to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time."

42 U.S.C. § 2014(aa) defines *"special nuclear material"* as "(1) plutonium, uranium enriched in the isotope 233 or in the isotope 235, and any other material which the Commission, pursuant to the provisions of section [51], determines to be special nuclear material, but does not include source material; or (2) any material artificially enriched by any of the foregoing, but does not include source material."

The Federal Water Pollution Control Act [33 U.S.C. § 1362(6)] defines pollutants, and, included in a list of specified pollutants are "radioactive materials." The Environmental Protection Agency has in effect defined the "radioactive materials" included under its control in 38 Fed.Reg. 13530, published May 22, 1973:

". . . the term *radioactive materials* as included within the definition of *pollutant* in section 502 of the Act covers only radioactive materials which are *not* encompassed in the definition of source, byproduct or special nuclear materials as defined by the Atomic Energy Act of 1954."

At the outset, plaintiffs face the hurdle that two agencies of peculiar and extreme expertise reach a conclusion diametric to the position of plaintiffs, and, certainly, the determinations of these agencies in this highly technical area are entitled to great weight. The height of the hurdle which plaintiffs must clear is not lowered by their flailing at the alleged incompetence of the AEC and by their charges that the AEC is impervious to the need for environmental protection and to the requirements of public safety. Such may be plaintiffs' views, but I am more persuaded by the comments of Chief Judge Arraj in Crowther v. Seaborg, D.C., 312 F.Supp. 1205, 1235, and, by the conclusions of Judge Hill in Crowther v. Seaborg, 10 Cir., 415 F.2d 437:

". . . the Atomic Energy Commission and the other cooperating governmental agencies are exercising the highest degree of care, caution and expertise to prevent any possible damage to life, property and natural resources."

Significantly, in the 90 pages of brief and supporting material filed by plaintiffs, no mention is made of either decision in Crowther v. Seaborg, but I am more inclined to adopt the view of our Chief Judge and the views of the Tenth Circuit than I am the views of the author of some obscure magazine article relied upon in plaintiffs' brief. I totally reject all arguments that the AEC and the EPA are not doing their best to protect the public health, safety and welfare. With the rejection of those arguments, there is not a great deal left of plaintiffs' brief, and, both parties being in agreement that there is no genuine issue of material fact, I grant defendants' mo-

tion for summary judgment. I grant it for these reasons:

1. Although plaintiffs can winnow a little solace from the 1725 pages of legislative history of the Water Pollution Control Act Amendments of 1972, the history overwhelmingly favors the interpretation placed on the Act and, more particularly, on § 502 of the Act, by the AEC and the EPA. That interpretation, oversimplified, is that the AEC has the exclusive jurisdiction over effluents from "source," "byproduct" and "special" nuclear materials. This legislative history must be read with the thought in mind that 33 U.S.C. § 1362(6) mentions "radioactive materials," but it doesn't say *all* radioactive materials, and, with this thought in mind the legislative history convinces me that Congress didn't intend to give the EPA jurisdiction over those materials. No point would be served by quoting the Congressional Record here, but I mention 117 Cong. Rec.S. 17401–402; the Report of the House Committee on Public Works on H.R. 11896, and the floor debate on that bill, 118 Cong.Rec.H. 2639. Other portions of the Congressional Record support defendants' position.

2. Perhaps it is possible for both the EPA and the AEC to regulate wastes of "source," "byproduct" and "special" nuclear materials, but for both to try to do so would be likely to create not only wasted effort, but, worse, confusion, and possible danger to the public. Recognizing that Northern States Power Company v. State of Minnesota (1971) 8 Cir., 447 F.2d 1143, had to do with joint state and federal regulation and recognizing that the preemption problem was paramount in the case, nevertheless, many of Chief Judge Matthes' comments in the decision are fully applicable here. I quote from p. 1148–1149 of that opinion:

"Federal regulation over the processing and use of source, by-product and special nuclear material and over production and utilization facilities was insured in the 1954 amendments by means of this comprehensive licensing system required by the Act. Moreover, the importance with which Congress viewed the maintenance of a federal system of regulation and control in this area is revealed in its findings, which are replete with policy statements concerning the need for regulation in the national interest in order to provide for the common defense and security and to protect the health and safety of the public. 42 U.S.C. § 202.

. . . . . .

"We are more concerned here with subsection (c) of § 2021 which *prohibits* the AEC from discontinuing its authority and responsibility with respect to the regulation of certain specified activities including 'the construction and operation of any production or utilization facility,' which would include the discharge of radioactive effluents from the facility or plant.

"There can be no doubt but that AEC control over 'the construction and operation of any production or utilization facility' necessarily includes control over radioactive effluents discharged from the plant incident to its operation. In analyzing § 2021(c)(1) in the Hearings before the Joint Committee on Atomic Energy, Mr. Lowenstein of the AEC at p. 306 explained:

'The activities covered under this provision (i) include but are not limited to the possession and storage at the site of the licensed activity of nuclear fuel, and of source special nuclear material and by-product materials used or produced in the operation of the facility; and the transportation of nuclear fuels to and from the reactor site and the discharge of effluent from the facility.

'Coming to the question you asked before, Mr. Ramey [Executive Director, Joint Committee], the purpose of this provision is to retain under Commission regulatory control the operation of the reactor. We did not feel that we could begin to cut up that into pieces, so to

speak. The discharge of effluent from the reactor involve many questions relating to the design and construction and operating procedures. We did not think it could be considered by itself and broken away from overall responsibility for the reactor operation.'

"However, Minnesota interprets this subsection only as prohibiting *total* relinquishment by the federal government over nuclear power plants, but does not view the concurrent exercise of state control over nuclear facilities as being forbidden by the Act.

"We cannot agree with Minnesota's position that dual control over atomic power plants and the level of effluents discharged therefrom is permissible under the Act. While the 1959 amendment does not use the terms 'exclusive' or 'sole' in describing existing regulatory responsibilities of the Commission, we think it abundantly clear that the whole tone of the 1959 amendment, upon examination of the statutory language alone, demonstrates Congressional recognition that the AEC at that time possessed the sole authority to regulate radiation hazards associated with by-product, source, and special nuclear materials and with production and utilization facilities." [Emphasis by the Court.]

The dissent in *Northern States Power Company* is much in line with the arguments of plaintiffs here, but I agree with the majority opinion in that case.

3. Threading through the two Crowther v. Seaborg opinions and through *Northern States Power Company* is the thought that when we deal with nuclear power, we are in the most highly specialized and potentially dangerous area known to our civilization. The EPA has enough problems without exercising joint jurisdiction with the AEC. We must make haste slowly in taking from the AEC the exclusive power to regulate and control nuclear energy. As I read the statute

and its legislative history, Congress has not said that it wants the EPA to enter this dangerous field. It has given the AEC control, and I think that it has given the AEC exclusive control. I cannot find that the AEC and the EPA were in error in their reading of the statute and in their reading of the Congressional intent.

4. An additional, although not controlling reason for my ruling is the energy crisis. To grant the relief requested by plaintiffs might shut down the federally owned Rocky Flats Plant and it would inevitably delay the coming on stream of the Ft. St. Vrain Generating Facility. I need not and do not rule on defendants' argument that plaintiffs have other remedies available to them. I simply hold that if the Rocky Flats Plant is to be shut down, or if the Ft. St. Vrain Generating Facility is to be shut down or slowed down while new rules, regulations and standards are studied and adopted by the EPA, it will be by order of an appellate court and not by order of this court.

These are the reasons I have granted defendants' motion for summary judgment. This leaves unresolved plaintiffs' lawyers claim for attorneys fees to be awarded against the government. The statute [33 U.S.C. § 1365(d)] permits the award of "costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such an award is appropriate." Plaintiffs' lawyers say that this permits an award of attorneys fees against the government even when the government prevails. This goes somewhat against my training and experience as a lawyer possessed of much experience in losing contingent fee cases. However, even if plaintiffs' lawyers are correct in their position that the government should pay losing counsel, I do not deem it appropriate that they be subsidized with taxpayers' money in this case, and I deem it inappropriate to award them attorneys fees. According-

ly, the request for an award of attorneys fees is denied, and summary jugment shall enter against plaintiffs and in favor of the defendants.