667 F.2d 908
 12 Envtl. L. Rep. 20,367
 Bill M. SILKWOOD, Administrator of the Estate of Karen G.
Silkwood, Deceased, Plaintiff-Appellee,
v.
The KERR-McGEE CORPORATION, a Delaware corporation, and
Kerr-McGee Nuclear Corporation, a Delaware
corporation, Defendants-Appellants.
 No. 79-1894.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 17, 1980.
Decided Dec. 11, 1981.
Rehearing Denied Feb. 19, 1982.
 
 William G. Paul, Oklahoma City, Okl., and Glenn W. McGee, Chicago, Ill. (L. E. Stringer, Richard C. Ford and John J. Griffin, Jr., of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., C. Lee Cook, Jr., William Van Hagey, Stephen A. Gorman and Pamela J. Kempin, of Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., and Elliott C. Fenton and Larry D. Ottaway of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., with them on the briefs), for defendants-appellants.
 Arthur R. Angel, Oklahoma City, Okl. (Jim Ikard, Oklahoma City, Okl., G. L. Spence, Jackson Hole, Wyo., and Daniel P. Sheehan, Washington, D. C., with him on the briefs), for plaintiff-appellee.
 Harry H. Voigt, Leonard M. Trosten and Michael F. McBride of LeBoeuf, Lamb, Leiby & MacRae, and Harvey S. Price, Gen. Counsel, Washington, D. C., on brief for amicus curiae Atomic Industrial Forum, Inc.
 Karin P. Sheldon, Sierra Club Legal Defense Fund, Washington, D. C., on brief for amici curiae Environmental Policy Institute and Sierra Club.
 Before DOYLE, McKAY and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This is an appeal by Kerr-McGee Corporation and Kerr-McGee Nuclear Corporation (hereinafter collectively referred to as Kerr-McGee) from judgments after jury trial in a diversity suit brought against them by Bill M. Silkwood as administrator of the estate of Karen Silkwood, deceased. The action was based upon common law tort principles[1] under Oklahoma law, and sought damages for injuries (primarily fear and anxiety) suffered by Karen Silkwood during a nine-day period as a result of plutonium contamination occurring November 5, 6, and 7, 1974. Her death on November 13, 1974, in an unrelated automobile accident marked the end of any damages that might have been suffered had she lived beyond that date. The jury awarded $500,000 damages for these injuries and an additional stipulated $5,000 for property in her apartment that had to be destroyed because it was contaminated. In addition it awarded $10,000,000 punitive damages. The opinion of the trial court overruling Kerr-McGee's post-trial motions is reported at 485 F.Supp. 566 (W.D.Okl.1979).
 
 
 2
 A number of issues are raised and argued on appeal, including applicability of the Oklahoma Workers' Compensation Act as the exclusive remedy, federal preemption, standard of care, applicability of strict liability, availability of certain defenses, excessiveness of actual damages, invalidity and excessiveness of punitive damages, insufficiency of the evidence, and denial of a fair trial because of adverse publicity, prejudicial conduct of counsel, and errors in evidentiary rulings and instructions to the jury. We recite below such essential facts and treat such of these issues as are necessary to resolve all aspects of the appeal.
 
 I. Personal Injury
 
 3
 Karen Silkwood was a laboratory analyst at the Cimmaron plant of Kerr-McGee located near Crescent, Oklahoma. The plant fabricated fuel pins containing plutonium for use as reactor fuel. Silkwood was contaminated by plutonium on November 5, 6, and 7, 1974, and the parties have stipulated that this plutonium came from the Kerr-McGee plant. Precisely how and when the contamination occurred is not stipulated and there is little evidence to fill this void.
 
 
 4
 Plutonium is an artificially produced radioactive chemical element which has been instrumental in the development of nuclear weapons and nuclear power. It emits alpha particles, beta particles, neutrons, gamma rays, and x-rays. The extent of radiation damage to human cells exposed to plutonium is dependent upon the amount of energy in the radiation. Alpha particles have the largest mass, carry the greatest amount of energy, and are the most hazardous. Damage can occur when alpha particles strike a cell. Damage to an individual cell is not, however, invariably harmful to the human body; a cell is capable of repairing itself and the body normally sheds and replaces millions of cells on a continuous basis. It is acknowledged, however, that plutonium is one of the most carcinogenic and dangerous substances known.
 
 
 5
 Silkwood was a member of the Oil, Chemical and Atomic Workers Union (OCAW), which represented some of the workers at Kerr-McGee's plant. As an elected member of the union negotiating team, Silkwood was responsible for health and safety matters. In September 1974 she, together with her fellow committee members, met with OCAW leaders in Washington, D. C., and presented charges to the Atomic Energy Commission (AEC) of numerous health and safety violations by Kerr-McGee. The AEC required documentation of the charges, and Silkwood was assigned the job of collecting this documentation. Silkwood was engaged in collecting information and recording it in notebooks and on tapes from September 1974 until the time of her death.
 
 
 6
 There is no real dispute in the evidence concerning Silkwood's contamination. She reported to work at the Cimmaron plant on November 5, 1974, at 1:20 p. m. At 2:45 p. m. and at 3:15 p. m., before and after taking a break, Silkwood monitored herself with plutonium detecting devices provided by Kerr-McGee in accordance with the company policies and AEC license requirements. No plutonium was detected on her person. At about 3:45 p. m. Silkwood began to work in two glove boxes containing plutonium. A glove box is a supposedly impervious box surrounding the plutonium processing equipment which has glove holes permitting the operator to work on the equipment or with the plutonium from outside the box. Silkwood again monitored herself before and after her break at 5:30 p. m. and at 5:45 p. m., and at those times detected no contamination. She continued to work in the glove boxes and, upon withdrawing her hands from one of the boxes at about 6:30 p. m., she found contamination. Further checks were made in the laboratory and other contaminations were found, particularly inside the gloves in the glove box in which Silkwood had been polishing and cleaning plutonium.
 
 
 7
 Contamination was found on Silkwood's left hand, right wrist, upper arm, neck, face, hair, and in her nostrils. Pursuant to regulations, Silkwood was immediately decontaminated and placed on a five-day voiding collection program, and furnished urine and fecal kits to take home for the purpose of obtaining samples which would be sent to the United States testing laboratory for analysis. Later that day Silkwood returned to work, but not to the glove boxes; she monitored herself when she left work at about 1:10 a. m. and found no contamination. The glove box was later tested by the AEC investigators, and no leaks were found. Further, the investigators found no significant airborne contamination in the laboratory.
 
 
 8
 The next day, November 6, 1974, Silkwood arrived at work at 7:50 a. m., and did some paper work in the lab until 8:50 a. m., at which time she left to attend a union meeting. At that time she tested herself and found contamination on her hands; tests showed fixed contamination on her right forearm, face, and neck. Her hands were decontaminated; since the other spots appeared to be fixed contamination she was allowed to attend the union meeting. She returned to the health office at 4:30 p. m., where slight contamination was found on her right forearm, neck and face, and in her nostrils. She was again decontaminated and, at her request, her locker and auto were tested and found to be free of contamination.
 
 
 9
 On November 7, 1974, when she reported to work Silkwood went directly to the plant's health physics office. She was found to be contaminated in her nostrils and on her hands, arms, chest, back, neck and right ear. Four urine and one fecal sample collected on November 5th, 6th and 7th were found to be contaminated, although the exterior of the kits showed no contamination. The parties stipulated that urine samples brought to the plant had been spiked with plutonium; that is, they contained insoluble, not naturally excreted, plutonium. Also, Silkwood's apartment was found to have been contaminated, with highest concentrations of plutonium found in the bathroom and on a package of bologna and cheese in the refrigerator.
 
 
 10
 Silkwood's roommate, Sherri Ellis, was also a laboratory analyst at Kerr-McGee, and was found not to be contaminated when she left work at 8:00 a. m. on November 7th after working a midnight shift. After returning to the apartment, Ellis used the bathroom and retired to her bedroom. Subsequent checks revealed contamination of Ellis' buttocks and hands. Ellis' auto and the refrigerator where her lunch had been placed in the plant lunchroom were free of contamination. Silkwood's boyfriend, who spent the night of November 6th in Silkwood's apartment, had left the apartment at about 7:00 a. m. on November 7th after using the bathroom. Neither he, his car, nor his residence were contaminated.
 
 
 11
 Silkwood's possessions were destroyed and Silkwood was sent to the Los Alamos Scientific Laboratory in New Mexico to undergo further tests concerning her contamination. She reported back to work on November 13th at which time she was reassigned. She participated in a union negotiating session that day, met with AEC inspectors concerning her contamination, and attended a union strategy session. On her way to meet a New York Times reporter and an OCAW leader, Silkwood was killed in an automobile accident. A subsequent autopsy revealed that the amount of plutonium within Silkwood's body at the time of her death was between 25% and 50% of the permissible lifetime body burden allowed by the AEC for plutonium workers.
 
 
 12
 Silkwood made statements that she had spilled her urine sample in her bathroom between 7:00 and 7:50 a. m. on November 7th, after her boyfriend left and before her roommate returned to the apartment from work. Silkwood stated that at the time she spilled the urine sample, a package of bologna was on top of the commode, where she had placed it in anticipation of preparing a sandwich to take to work. Following the spilling of the sample, Silkwood stated that she wiped off the bathroom floor with a tissue and placed the bologna back in the refrigerator. That evidence was admitted only to show Silkwood's state of mind, motivation, or intention relevant to the issue whether she intentionally removed the plutonium from the plant; it was not admitted to show the truth of the statements.
 
 
 13
 The only other evidence supporting inferences relevant to where and how Silkwood was contaminated is as follows. Except for the fact that Silkwood was in a radiation zone for an hour on November 6 before discovering contamination on her person, and Silkwood's statement that she thought she was inadequately decontaminated on November 5, there is no evidence of where, when or how she became contaminated on November 6th. She did not work the glove boxes that day and no other contamination was observed. Apparently employees were not monitored for radiation upon arriving at work, although they were subject to self and other monitoring each time they removed their hands from glove boxes and when exiting rooms and air locks. Evidence showed Silkwood was sloppy in her safety habits, failing to monitor herself or tuck her hair into the cap she was required to wear in the laboratory.
 
 
 14
 The insoluble plutonium used to spike the urine samples was not of the same batch Silkwood was working with in the glove boxes at the time of her exposures. The material could have come, however, from a slot box in the laboratory area to which Silkwood and other Kerr-McGee employees had access. The Kerr-McGee inspection system would not detect amounts of plutonium of less than about 1/2 gram taken from the plant in a nonmetallic container. (The amount in Silkwood's apartment was estimated at less than .0003 gram.)
 
 
 15
 There was evidence that Kerr-McGee's supervisory employees knew Silkwood was attempting to gather evidence of Kerr-McGee's negligent and improper practices in the operation of the plant and that some disapproved of her and these activities. There was also evidence that Silkwood was unhappy with a reprimand she had received shortly before her November 5 contamination and that she wanted to embarrass Kerr-McGee.
 
 
 16
 In an obvious attempt to avoid application of the workers' compensation law, the complaint asserted that all exposures originated in Silkwood's apartment. A pretrial motion for summary judgment based upon the exclusive application of the workers' compensation law was properly denied because factual issues had not been resolved as to how the exposure occurred. The Kerr-McGee assertion that workers' compensation applied to the personal injuries was reasserted at the conclusion of the case and in the motion for judgment n. o. v. The trial judge's refusal to grant the motions or to instruct the jury on the workers' compensation issue was based upon his view that Kerr-McGee had the burden of proving job relatedness of the contamination and that there is no presumption upon which Kerr-McGee was entitled to rely.
 
 
 17
 As the trial judge recognized, there was absolutely no evidence that someone other than Silkwood or a Kerr-McGee employee intentionally or accidentally exposed Silkwood to plutonium contamination. No intentional contamination, either by Silkwood or Kerr-McGee, was established. The judge properly refused to give a jury instruction on intentional contamination by action of a Kerr-McGee employee, for lack of credible evidence. The evidence that Kerr-McGee employees might have disliked Silkwood and her evidence-gathering activities and that plutonium could and did escape the plant is not enough to support a finding that Kerr-McGee operatives intentionally exposed Silkwood to contamination. The only plausible method by which Kerr-McGee could intentionally contaminate Silkwood would be by placing plutonium in the urinalysis kits it sent home with her; there is no evidence to support such a theory. The court gave an instruction permitting the jury to find whether Silkwood intentionally removed plutonium from the plant. The jury found she did not. We agree that sufficient evidence was presented to support the court's instruction, and that the evidence was not so strong as to require the jury to find Silkwood intentionally took the plutonium.
 
 
 18
 The trial court refused for lack of evidence to submit to the jury the issue of an accidental contamination of Silkwood. Here we disagree. Indeed, we hold that, in light of the lack of evidence of intentional contamination by Kerr-McGee operatives, Silkwood, or others, the presumptions and burdens of proof applicable to workers' compensation issues required the court to grant judgment n. o. v. holding that workers' compensation was the exclusive remedy for personal injuries suffered by Silkwood.
 
 
 19
 The Oklahoma Workers' Compensation Act, Okla.Stat.Ann. tit. 85 (West 1971 & Supp.1980), provides that the employer shall pay compensation "for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment ...." Id. § 11. Section 12 of the Act provides that the liability prescribed in section 11 "shall be exclusive and in place of all other liability of the employer and any of his employees, at common law or otherwise ...." Section 27 clarifies the scope of coverage indicated in section 11 by creating a presumption. "In any proceeding for the enforcement of a claim for compensation under this act, it shall be presumed in the absence of substantial evidence to the contrary: 1. that the claim comes within the provisions of this act." Id. § 27.
 
 
 20
 No Oklahoma case addresses directly the question whether an employer as well as an employee may invoke the presumption of coverage. But the courts that have construed similar liberal construction rules have unanimously held that the same rules of coverage apply regardless of who seeks their application. See Arnold v. Shell Oil Co., 419 F.2d 43 (5th Cir. 1969); Jackson v. Southern Pac. Co., 285 F.Supp. 388 (D.Nev.1968); Freire v. Matson Nav. Co., 19 Cal.2d 8, 118 P.2d 809 (1941); Wilburn v. Boeing Airplane Co., 188 Kan. 722, 366 P.2d 246 (1961); Thibodaux v. Sun Oil Co., 40 So.2d 761 (La.App.1949), aff'd, 218 La. 453, 49 So.2d 852 (1950); Smith v. Alfred Brown Co., 27 Utah 2d 155, 493 P.2d 994 (1972).
 
 
 21
 There are persuasive reasons underlying these consistent holdings. As pointed out by the Freire decision, the liberal construction in favor of jurisdiction is not intended merely to ensure the benefits of the act for injured employees, thus sparing them the necessity of expensive and speculative trials; it is also intended to protect the employer from excessive judgments. 118 P.2d at 810. See Jackson v. Southern Pac. Co., 285 F.Supp. at 389. We believe the Oklahoma Supreme Court holdings are in accord with this principle. In one case which held that an insurer's right to subrogation was abrogated by the Workers' Compensation Act, that court stated:
 
 
 22
 "(W)e think the Workmen's Compensation Act, in effect, was reciprocal in eliminating common-law rights, it was compensatory to both employer and employee. To the employee the act provided a summary action, it insured the workmen a living wage, when injured. As to both, it took away a jury trial. As to the employer, it created a maximum loss as well as making the amount of recovery certain."
 
 
 23
 Fox v. Dunning, 124 Okl. 228, 255 P. 582, 585-86 (1927).
 
 
 24
 Most recently, in the case of Harter Concrete Products, Inc. v. Harris, 592 P.2d 526 (Okl.1979), the Oklahoma Supreme Court held that an employer could not be joined in a product liability action as a third party defendant because workers' compensation was the exclusive remedy.
 
 
 25
 "Worker's compensation legislation was enacted to provide a substitute remedy to an employee for accidental injuries received during covered employment without the burden of his proving negligence. In exchange for this exposure the employer is protected from any other liability to the employee. To be equitable as well as effective, this protection must extend to all liability either directly or indirectly derived from the employee's injuries."
 
 
 26
 Id. at 528 (footnotes omitted) (emphasis in original).
 
 
 27
 Another reason given for an evenhanded application of the presumption is that the objective of doing equal justice cannot be attained absent a consistent application of the rules. See Buhler v. Gossner, 530 P.2d 803, 805 (Utah 1975); Smith v. Alfred Brown Co., 27 Utah 2d 155, 493 P.2d 994, 995 (1972).
 
 
 28
 Against this persuasive authority, plaintiff argues that the prefatory language to section 27 compels a decision that an employer may not avail itself of the presumption in proceedings brought outside those described in the Act. This key language provides the presumption will apply "(i)n any proceeding for the enforcement of a claim for compensation under this act ...." Okla.Stat.Ann. tit. 85, § 27. We believe that plaintiff's construction would not only violate the aforementioned principles enumerated by other jurisdictions, but would also destroy the exclusive jurisdiction compelled by the Act. Were the presumption to be applied only when an employee brought a claim in the Workers' Compensation Court, then a certain number of borderline cases would be sustained only by operation of the presumption. If these same cases were brought at common law and were deemed not subject to the presumption, they would be found to be outside the Act. Thus, an overlapping jurisdiction would exist for a number of cases open to the election of the employee. Such a result seems to contradict the Act's clear intent, expressed in section 12, of limiting recovery to that provided in the Act for all cognizable claims. See Arrington v. Michigan-Wisconsin Pipeline Co., 632 F.2d 867, 871 (10th Cir. 1980). For these reasons, we believe the Oklahoma Supreme Court would hold that the presumptions contained in section 27 are applicable regardless of who seeks to make use of them.
 
 
 29
 We agree with plaintiff that inasmuch as exclusive jurisdiction is an affirmative defense, Kerr-McGee had the burden of producing evidence sufficient to demonstrate that the injuries were covered by the Act. See Oklahoma Steel Casting Co. v. Banks, 181 Okl. 503, 74 P.2d 1168 (1937). The method of proving that an injury arose out of and in the course of employment would be the same regardless of whether it is offered by the employee to prove a claim or by the employer seeking to bar an action at common law. See Eckis v. Sea World Corp., 64 Cal.App.3d 1, 134 Cal.Rptr. 183 (1976). The method by which injuries occurring under somewhat mysterious circumstances are proven is outlined in In re May, 586 P.2d 738 (Okl.1978). In that case, representatives of a driver of a service vehicle sought recovery for the death of the driver who was found shot to death in a rural field. His log indicated that he had completed his route. The Supreme Court of Oklahoma rejected the employer's contention that because there was no competent evidence to indicate that the death arose out of and in the course of employment, the compensation award was in error. Relying on In re Martin, 452 P.2d 785 (Okl.1969) and Nebo Oil Co. v. Wright, 406 P.2d 266 (Okl.1965), the court first noted that compensation law indulges a presumption that a claim for injury is within the Act absent substantial evidence to the contrary. Any reasonable doubt is to be resolved in favor of the claimant. 586 P.2d at 740. Second, the court noted that the claimant could meet his burden of producing competent evidence that the injury occurred during the course of employment by use of circumstantial evidence. The circumstantial evidence need not exclude every other possible inference, but is only required to provide a legal and logical basis for a reasonable inference as to the existence of the fact sought to be proven. Id. at 740-41. Once this reasonable inference of coverage is established, a prima facie case has been made out that workers' compensation is the exclusive remedy, and it is then incumbent upon the plaintiff to show the nonexclusivity of the statutory compensation remedy as to each element of the injuries for which plaintiff seeks common law relief. Murphy v. Owens-Corning Fiberglas Corp., 447 F.Supp. 557, 571 (D.Kan.1977).
 
 
 30
 With these rules in mind, we again review the evidence. Silkwood was a laboratory analyst at the Kerr-McGee plant and handled plutonium in the regular course of her employment. It is undisputed that on the first day of her contamination, November 5, 1974, Silkwood was found to be contaminated after spending some three hours grinding and cleaning plutonium. Silkwood had monitored herself three times during the course of the same work period and found no contamination each time. After Silkwood was found to be contaminated, the gloves in the glove box she had been using were found to be contaminated. Silkwood was decontaminated at work and given urine and fecal kits to check for plutonium discharges. This is the only evidence relating to the November 5th exposure and it supports only one inference: that the exposure was job-related.
 
 
 31
 Of the three exposures occurring on November 5th, 6th and 7th, that of November 6th is the least understood in terms of when and where it happened. On November 6th, Silkwood arrived at work at 7:50 a. m. and performed paperwork in the laboratory, which was in a radiation zone. Apparently she was not checked for contamination at the time she arrived at work, but upon leaving the laboratory at 8:50 a. m., she checked herself and discovered contamination on her hands, her right forearm, and her face and neck. Her hands were decontaminated immediately, but to permit Silkwood to attend a union meeting the fixed contamination on the rest of her body was not decontaminated until the end of the day. At most this evidence could support an inference that the November 6th exposure occurred at the job site which was known to be a place where plutonium was present. Alternatively, the evidence might support a finding that, as Silkwood stated, the contamination discovered on November 6th was residual contamination from her on-the-job exposure of the day before. Any other inference would be far too speculative based on this record.
 
 
 32
 Upon her arrival at work the next day, November 7th, Silkwood was found to be highly contaminated. The urine sample she took that morning at her apartment was spiked and her apartment was found to be contaminated, particularly the bathroom, kitchen, and her bedroom. Her roommate was found to be contaminated on her buttocks and hands. The only reasonable explanation for the roommate's contamination is that it came from the toilet in the apartment after Silkwood had taken her urine sample and departed for work. In view of the lack of contamination of other individuals who occupied the apartment during the course of the evening of the 6th and until 6:50 a. m. on the morning of the 7th, the only reasonable inference that can be drawn from the circumstantial evidence is that the contamination of the apartment, Silkwood, and her roommate resulted from Silkwood's preparation that morning of the urine sample. It is undisputed that the urine sample was spiked, although it is not known who spiked it or from what source. Since the urine sample was prepared at the direction of her employer as a part of her job-related duties, the only inference not based on the sheerest speculation that can be drawn from the evidence is that the contamination measured on the 7th was also job-related. The only other evidence that properly can be considered leads to the same conclusion.[2]
 
 
 33
 The circumstantial evidence supports one conclusion: that Silkwood's exposure on all three occasions occurred either at the job site or in preparation of urine samples for her employer. In the absence of any other evidence of offsite exposure,[3] the only reasonable inference is that all the plutonium found in her body came from her working with and around plutonium or from the preparation of job-related urine samples that were spiked. Plaintiff's own expert witness testified that no one could be sure when the exposure occurred that resulted in the deposition of plutonium in Silkwood's lungs.
 
 
 34
 While the circumstantial evidence as to the time, place, and manner of exposure is thin at best, it cannot support any conclusion other than that the exposures were job-related. Even were we to conclude that the evidence is too thin standing alone to support any conclusion, we are satisfied that, aided by the liberal construction rule favoring coverage, Kerr-McGee has established a prima facie case that the injury comes within the provisions of the workers' compensation statute. We now hold that plaintiff has not produced substantial evidence that Silkwood's injury occurred outside the course of her employment to rebut this prima facie case.
 
 
 35
 The trial court's comparison of this case to that of a factory worker engaged in the manufacture of television sets who is injured when his home television blows up is inapposite. In that case the reasonable inference is that the television is for private use, and no circumstances suggests that the explosion is related to his work rather than his ownership of the set. In the instant case, by contrast, there is a logical nexus between Silkwood's injury and her work.
 
 
 36
 Silkwood's counsel complained that Kerr-McGee's evidence was all directed to prove intentional taking by Silkwood and self-contamination. It is true that in pretrial investigations and at trial Kerr-McGee employees testified to beliefs and theories that no incident at the plant had been the source of the contamination, that the contamination was self-administered, that it was unlikely to have been accidental, or that she was contaminated offsite. While Kerr-McGee attempted to establish an intentional taking of plutonium by Silkwood and intentional or accidental self-contamination thereafter, it never abandoned the alternative theory of a job-related accident. Kerr-McGee could avoid liability altogether if it could establish an intentional taking by Silkwood; it could avoid a common law tort claim for personal injuries if it could establish a job-related accidental exposure. We do not consider its witnesses' statements concerning self-contamination by Silkwood as admissions that no job-related accidental exposure was possible.
 
 
 37
 Plaintiff contends that the Workers' Compensation Court has exclusive jurisdiction only if it is shown that the worker would actually have received compensation and, since it was not shown that Silkwood's injury was presently disabling, no compensation would have been awarded. Plaintiff argues that because section 12 provides that "(t)he liability prescribed in the last preceding section shall be exclusive" and section 11 prescribes only liability for disability or death, all non-disabling injuries may be pursued at common law. Kerr-McGee counters with an argument there was no injury to Silkwood here at all, since she did not contract cancer during her life. This Court has recognized that a complaint based upon the possibility of contracting cancer in the future as a result of past exposure to a carcinogenic substance does not state a common law cause of action. Bussey v. Safeway Stores, Inc., (10th Cir. Sept. 19, 1978). Of course, a claim for illness already suffered is cognizable. Id.
 
 
 38
 Here Kerr-McGee was entitled to a finding that Silkwood's contamination was on the job, as we have discussed above. If cancer is developed from a radiation exposure on the job, the workers' compensation law covers it. See Okla.Stat.Ann. tit. 85 § 11(4) (West Supp.1980) (with reference to Okla.Stat.Ann. tit. 85 § 3(7), (10) (West Supp.1980)). In the instant case the radiation produced hysteria and fear in Silkwood and the need for medical treatment and examination. The Workers' Compensation Act requires reimbursement for medical attention from job-related accidents. Id. § 14. Silkwood missed time from work at least during testing, and she incurred medical expense, paid by Kerr-McGee. But even if she had not, work time loss and medical expense are not necessary requisites to finding an injury is exclusively covered by workers' compensation. If a worker on the job received a hammer blow to the thumb causing pain and suffering but no time loss, surely he or she could not sue the employer in a common law tort action. We believe the Oklahoma Supreme Court would hold that any accidental injury incurred on the job would be covered by the Workers' Compensation Act, and that the radiation exposure here is such a case. The fact the Act does not compensate for every aspect and degree of the injury makes no difference. In Smith v. Baker, 157 Okl. 155, 11 P.2d 132 (1932), a case in which a man lost his sexual organs in the course of employment, the Supreme Court of Oklahoma said, "The fact that Workmen's Compensation Act does not provide adequate relief in all cases does not authorize a civil action for recovery of damages." The Oklahoma court is in agreement with other jurisdictions that have considered this issue. See 2A Larson, Workmen's Compensation § 65.20 (1976).
 
 
 39
 We have considered plaintiffs' other contentions in regard to this issue, and find them to be without merit. We conclude the court erred in not ruling that the issue of personal injury must be determined under the Workers' Compensation Act. Our disposition on this issue eliminates the need to discuss the sufficiency of the evidence and other arguments relating to the amount of damages for personal injury and the fairness of the trial on that aspect of the case. We do not understand Kerr-McGee to contend that the federal regulation of nuclear energy preempts application of the workers' compensation law for injuries on the job. See Appellants' Brief p. 56 n.*. See also S.Rep.No.296, 85th Cong., 1st Sess., reprinted in (1957) U.S.Code Cong. & Ad.News 1803, 1819.
 
 II. Property Damage
 
 40
 The existence here of significant damage to Silkwood's personal property in her apartment requires us to consider additional issues raised in the appeal. The Workers' Compensation Act applies only to "accidental personal injury." Okla.Stat.Ann. tit. 85, § 11 (West Supp.1980). See also id. §§ 2, 3(7).
 
 
 41
 Kerr-McGee argues that the pervasive federal regulation of atomic energy precludes states from applying stricter safety standards for the handling of nuclear materials than required by AEC regulations. As applicable to the issue of its liability for actual damage to Silkwood's personal property, Kerr-McGee asserts that its substantial compliance with preemptive federal regulations is conclusive evidence of due care and precludes holding it liable under a strict liability standard.
 
 
 42
 Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir. 1971), aff'd mem., 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), upon which Kerr-McGee places its principal reliance, declared that federal preemption precludes a state from exercising regulatory authority over the discharge of radioactive effluents from nuclear power plants in the state. See also Train v. Colorado Public Interest Research Group, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). As Northern States recognizes, the determination whether the federal scheme precludes state rules is primarily a matter of the intent of Congress. Imposing a state tort law rule of strict liability for nuclear-related property damage occurring off the plant site might, in some instances, encroach upon federal regulations setting effluent or other standards. See State Dept. of Environmental Protection v. Jersey Central Power & Light Co., 69 N.J. 102, 351 A.2d 337 (1976); Van Dissel v. Jersey Central Power & Light Co., 152 N.J.Super. 391, 377 A.2d 1244 (1977). We do not think imposition of tort liability in the instant case, in which a quantity of plutonium has escaped the plant site and caused damage, will significantly interfere with federal regulation of Kerr-McGee's plant. Further, the AEC (now Nuclear Regulatory Commission (NRC)) does not have power, except as it is involved in the administration of the Price-Anderson Act, to order a compensatory award to a victim of a nuclear incident. See Marshall v. Consumers Power Co., 65 Mich.App. 237, 237 N.W.2d 266 (1975). Clearly there is need for such a remedy. The Supreme Court and Congress have recognized that state tort law principles are applicable to some extent in off-site damage cases. In upholding the constitutionality of the Price-Anderson Act, the Supreme Court stated that "(a)ppellees' only relevant right prior to the enactment of the Price-Anderson Act was to utilize their existing common-law and state-law remedies to vindicate any particular harm visited on them from whatever sources." Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 88 n.33, 98 S.Ct. 2620, 2638 n.33, 57 L.Ed.2d 595 (1978). The Price-Anderson Act, 71 Stat. 576 (1957) (codified in scattered sections of 42 U.S.C.), was passed to address the problem of liability for nuclear disasters which might deter the industrial development of nuclear energy. It requires AEC (NRC) licensees to purchase private insurance, creates a government indemnity fund, and establishes maximum limits to liability for an "extraordinary nuclear occurrence." 42 U.S.C. § 2210(n). For nuclear incidents below the level of an extraordinary nuclear occurrence, and the instant case is one, the rules of tort law of the state in which the injury occurred still apply.
 
 
 43
 "(T)he bill has been drafted so that minor claims involving nuclear facilities or materials may remain subject to the traditional rules of tort law."
 
 
 44
 S.Rep.No.1605, 89th Cong., 2d Sess., reprinted in (1966) U.S.Code Cong. & Ad.News 3201, 3211. See also id. 3203-04, 3206, 3207, 3209, 3226; S.Rep.No.296, 85th Cong., 1st Sess., reprinted in (1957) U.S.Code Cong. & Ad.News 1803, 1810, 1823. Kerr-McGee argues that although state tort law applies the federal regulations determine the controlling standards, foreclosing application of strict liability. But that same Senate report recognizes that a state can apply strict liability principles if it chooses.
 
 
 45
 "(A) claimant would have exactly the same rights that he has today under existing law-including perhaps, benefit of a rule of strict liability if applicable State law so provides."
 
 
 46
 S.Rep.No.1605, 89th Cong., 2d Sess., reprinted in (1966) U.S.Code Cong. & Ad.News at 3212. See also id. 3203, 3206, 3207.
 
 
 47
 We have no doubt Oklahoma courts would apply strict liability to this case of escape of plutonium, a highly toxic and dangerous substance. Young v. Darter, 363 P.2d 829 (Okl.1961) (herbicide spray). See also Kirkland v. General Motors Corp., 521 P.2d 1353 (Okl.1974). Nuclear energy is surely an area "in which no court will, at last, refuse to recognize and apply the principle of strict liability." W. Prosser, The Law of Torts, § 78, at 516 (4th ed. 1971); see Restatement (Second) of Torts § 520, comment (g) (1977) ("Some activities, such as the use of atomic energy, necessarily and inevitably involve major risks of harm to others, no matter how or where they are carried on.")
 
 
 48
 We have no trouble with proximate cause in the context of damage to personal property in Silkwood's apartment. It was stipulated that the plutonium came from the Kerr-McGee plant; clearly the property damage was the result of plutonium contamination. Regarding one who carries on an abnormally dangerous activity, Restatement (Second) of Torts § 519, comment (e) (1977) states that strict liability applies to "harm that is within the scope of the abnormal risk that is the basis of the liability." The key is foreseeability. It is surely foreseeable and within the scope of the abnormal risk that radiation contamination will occur from contact with plutonium that escapes a nuclear fuel plant. Just as the risk incident to dynamite is accidental explosion, a risk incident to plutonium is accidental contamination. The jury's finding that Silkwood did not intentionally carry the plutonium from the plant to her apartment eliminated the only possible intervening cause for which any evidence was presented.
 
 
 49
 Since strict liability applies and the stipulated amount of the property damage was $5,000, claims of prejudicial publicity and other alleged trial errors would have no application to this property damage claim. While evidence excluded by the trial court concerning the state of Silkwood's health might be relevant to her personal injuries, it does not seem relevant to the jury's finding that she did not deliberately remove the plutonium from the plant. Therefore, we find no error in the judge's direction to the jury to return in its verdict $5,000 in damages for the personal property if it found no intentional taking of the plutonium by Silkwood.
 
 III. Punitive Damages
 
 50
 Kerr-McGee makes several arguments that the award of punitive damages is improper. We need consider only one, the claim of federal preemption.
 
 
 51
 As discussed above, the Price-Anderson Act contemplates that state tort law applies in at least some cases involving nuclear incidents; we have found that a claim for compensatory damages for off-site contamination caused by the escape of plutonium is one such situation. Nowhere in the Price-Anderson Act or its legislative history have we found express mention of punitive damages. References in the Price-Anderson Act that state law may determine tort liability may be read to permit punitive as well as compensatory damages in states like Oklahoma which permit them. However, with respect to "extraordinary nuclear occurrences" which are covered by statutory insurance, indemnity fund, and liability limitations, the Price-Anderson Act implicitly assumes that only compensatory damages will be awarded. See also Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 93, 98 S.Ct. 2620, 2640, 57 L.Ed.2d 595 (1978), ("The Price-Anderson Act not only provides a reasonable, prompt, and equitable mechanism for compensating victims of a catastrophic nuclear incident, it also guarantees a level of net compensation generally exceeding that recoverable in private litigation.") (Emphasis added.)
 
 
 52
 More importantly, punitive damages are "awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1979). See also City of Newport v. Fact Concerts, Inc., --- U.S. ----, ----, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (June 26, 1981). Thus there is a deterrent or regulatory effect in punitive damages, which the trial judge explicitly recognized in the instant case. In jury instruction number 19 the court directed the jury that it "may give damages for the sake of example and by way of punishment," noting that punitive damages are allowed "both as a restraint upon the transgressor and as a warning and example to deter the commission of like offenses in the future." 485 F.Supp. at 603. In denying Kerr-McGee's motion for judgment n. o. v., the court mentioned the substantial evidence of poor training, poor security, and indifference to hazards. Id. at 591. The court's general treatment of the punitive damages issue clearly demonstrates its approval on the basis that Kerr-McGee so negligently and indifferently operated the plant that punitive damages were appropriate to punish Kerr-McGee and to deter it and others from similar bad practices in the future.
 
 
 53
 The problem with awarding punitive damages in this case, however, is that Northern States read the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2284, particularly section 2021, as preempting state regulation of radiation hazards resulting from atomic energy development. The Supreme Court accepted the Eighth Circuit's conclusion that "Congress intended to pre-empt the field of the licensing and regulation of nuclear reactors to the exclusion of the states and ... did not intend to provide for dual regulation of radiation hazards, even as to those activities which could be turned over to the states." 447 F.2d at 1151. Northern States traced the history of atomic energy development in the United States from a government monopoly through the congressional decision, effectuated in the Atomic Energy Act of 1954 with its subsequent modifications and additions, to encourage private industry to participate. Specifically, the decision held that Minnesota could not impose state licensing requirements to regulate radiation emissions from nuclear power plants in that state.
 
 
 54
 Other cases have recognized the strong federal interest in atomic energy development. In Train v. Colorado Public Interest Research Group, 426 U.S. 1, 17, 96 S.Ct. 1938, 1945, 48 L.Ed.2d 434 (1976), the Supreme Court appears to have reaffirmed its memorandum holding in Northern States by ruling that the Atomic Energy Commission (now NRC) has exclusive control over the discharge of nuclear materials. In United States v. City of New York, 463 F.Supp. 604 (S.D.N.Y.1978), the court found that federal preemption precluded New York City from licensing nuclear reactors in the city. Although recently the Ninth Circuit upheld California's statutes requiring state approval of proposed nuclear plants and their locations within California, it recognized Congress's intent to assert exclusive federal control over radiation hazards associated with nuclear energy. Pacific Legal Foundation v. State Energy Resources Conservation and Dev. Comm'n, Nos. 79-3365, 79-3382, 80-4265 & 80-4273 (9th Cir. Oct. 7, 1971).
 
 
 55
 Arguably there should be a strong presumption against preemption of state laws affecting such vital interests of its citizens as those involved in the instant case. However, the nuclear industry was initially developed by the federal government, is closely linked with national security, and is extensively regulated by a federal agency. This apparently is the basis upon which Northern States was decided. See Note, A Framework of Preemption Analysis, 88 Yale L.J. 363, 379-81 (1978). We cannot read that case and Train other than as requiring us to hold invalid any state action that competes substantially with the AEC (NRC) in its regulation of radiation hazards associated with plants handling nuclear material. A judicial award of exemplary damages under state law as punishment for bad practices or to deter future practices involving exposure to radiation is no less intrusive than direct legislative acts of the state. Thus we hold punitive damages may not be awarded in this case.
 
 
 56
 It does not matter whether Kerr-McGee violated AEC regulations in the conduct of its plant operations. The AEC (NRC) has comprehensive powers to punish and prohibit practices it regards as improper, through its power and responsibility to license, 42 U.S.C. § 2131, investigate, id. § 2271, enjoin, id. § 2280, and seek civil and criminal penalties. Id. § 2272, 2273, 2282.
 
 
 57
 We need not consider other alleged errors asserted by Kerr-McGee in its appeal. The decision is affirmed in part and reversed in part and remanded to the district court for further considerations consistent herewith.
 
 
 58
 WILLIAM E. DOYLE, Circuit Judge, dissenting.
 
 
 59
 I disagree with most, but not all, of the points which are developed in the majority opinion. I disagree also with the result reached. I have no disagreement with the affirmance of the award of $5,000 to the estate of Karen Silkwood based upon destruction of her furniture and belongings.
 
 
 60
 * Alleged Exclusiveness of the Remedy of Workmen's Compensation
 
 
 61
 From the fact that the statute presumes in favor of the existence of a workmen's compensation remedy where an employee is injured and makes a claim, the majority opinion reaches the conclusion that this presumption is also available to the Company where the employee has not made a claim. No such suggestion is made in the statute. Authority in support of this position is either meagre or non-existent.
 
 
 62
 The first issue to be considered is whether the workers' compensation remedy is exclusive as a matter of law under the facts in the record. Kerr-McGee's position is that the evidence and the law call for liberal construction in favor of coverage and that, therefore, the exclusive remedy was that under workers' compensation. The cases say that the Act is not to be given a narrow, restricted meaning and must receive broad and liberal interpretation in order to realize its intent; reasonable doubt as to whether the injury arose out of and in the course of employment is to be resolved in favor of an injured workman. City of Nichols Hills v. Hill, 534 P.2d 931, 934 (Okl.1975); Murphy v. Owens-Corning Fiberglass Corp., 447 F.Supp. 557, 571 (D.Kan.1977), aff'd. 78-1082 (10th Cir. July 13, 1979).
 
 Workers' Compensation as an Issue of Fact
 
 63
 Alternatively, however, Kerr-McGee maintains that it was entitled to have the workers' compensation issue submitted to the jury. The argument is that the trial court erred in refusing to instruct the jury on the subject of worker's compensation inasmuch as Oklahoma law provides for jury determination of the coverage question where the evidence is conflicting. The Oklahoma courts have held that, in a common law tort action where the worker's compensation defense is raised, the jury must be instructed on the defense unless as a matter of law only one inference can be drawn from the evidence: "where there is room for a reasonable difference of opinion as to the proper inference to be drawn from the known facts, the issue (of worker's compensation) is for the jury under proper instructions by the court." Flick v. Crouch, 434 P.2d 256 (Okl.1967).
 
 
 64
 Oklahoma considers the question as one of fact for the jury where a question exists as to whether the injury occurred on the job or, on the other hand, away from the job.
 
 Analysis of the Evidence
 
 65
 Three incidents in which Silkwood was shown to have had plutonium contamination are established by the evidence. The resulting inferences indicate that the sources of the contaminations were both Silkwood's apartment and the Kerr-McGee laboratory. Since neither place was an exclusive source, the issue qualified as a factual dispute.
 
 
 66
 The first of the three incidents occurred on November 5, 1974 at 1:20 p. m. when Silkwood reported for work. At 2:45 and 3:15, before and after taking a break, Silkwood monitored herself with a plutonium detecting device provided by Kerr-McGee in accordance with the AEC requirements. No plutonium was detected on her person at that time. However, about 3:45 p. m. Silkwood began to work in two glove boxes which contained plutonium. A glove box is a supposedly impervious box surrounding the plutonium processing equipment which has glove holes allowing the operator to work on the equipment with the plutonium from outside the box. When Silkwood monitored herself at 5:30 p. m. and 5:45 p. m., no contamination was detected. She continued to work in the glove boxes and upon withdrawing her hands from one of the boxes about 6:30 p. m. she did find contamination. Further checks were made in the laboratory and other contaminations were found, particularly inside the gloves and the glove box in which she had been working, polishing and containing plutonium. The contamination was found on Silkwood's left hand, right wrist, upper arm, neck, face, hair and in her nostrils. She was immediately decontaminated and placed on a five day voiding collection program, and was furnished with urine and fecal kits to take home for the purpose of obtaining samples which were to be sent to the United States Testing Laboratory for analysis. She monitored herself at 1:10 a. m. and found no contamination. The glove box was later tested by AEC investigators and no leaks were found. The investigators found no significant airborne contamination in the laboratory.
 
 
 67
 The second of the three incidents occurred on November 6, 1974. Silkwood arrived at work that day at 7:50 a. m. and did some paperwork in the lab until 8:50 a. m. At that time, she left to attend a union meeting. Before leaving she tested herself and found contamination on her hands. Tests showed fixed contamination of her right forearm, face and neck. Her hands were then decontaminated. Since the other spots appeared to be fixed contamination, she was allowed to proceed to the union meeting. She returned to the health office at 4:30 p. m., where a slight contamination was found on her right forearm, neck and face and in her nostrils. Again she was decontaminated, and at her request her locker and auto were tested and found to be free of contamination. The described second incident raises a question because she had not been working with plutonium on the 6th of November at all. She had been restricted to paperwork in the lab prior to going to the union meeting. When she was monitored, the tests showed that she was contaminated, but she apparently had had no exposure within the plant which would have produced contamination. The logical inference is that this contamination occurred away from the plant.
 
 
 68
 The third incident of contamination occurred the next day, November 7th, 1974. This apparently occurred away from work. Silkwood went directly to the plant's health and physical office when she reported to work. There she was found to be contaminated in her nostrils and on her hands, her arms, chest, back, neck and right ear. Four urine samples and one fecal sample collected on or after November 4th were found to be contaminated, although the exterior of the kits showed no contamination. It was stipulated by the parties that urine samples brought to the plant had been spiked with plutonium; that is, they contained insoluble, non-naturally excreted plutonium. Here again the positive evidence was that the exposure occurred in her apartment.
 
 
 69
 It was after this that Silkwood's apartment was found to have been contaminated. The highest concentrations of plutonium were found in the bathroom and on a package of bologna and cheese in the refrigerator. It could be inferred that the contamination from the first incident occurred within the plant. This was the day that she was working inside the glove boxes. On the second day, however, she had been performing paperwork in the lab until 8:50 a. m., at which time she left to attend a union meeting. Before leaving she tested herself and found contamination on her hands, etc. We noted above that she had had no exposure within the plant which would have produced contamination, with the possible exception of the papers that she was working with.
 
 
 70
 The third contamination incident obviously occurred away from the plant and presumably at her home because she went directly to the physical health office when she reported for work and was found to be contaminated in her nostrils, on her hands, arms, chest, back, neck and right ear. This was the day, too, that she presented urine samples spiked with plutonium.
 
 
 71
 The majority opinion concludes that the inference to be drawn is that all of the plutonium contamination occurred at the plant. This, however, ignores the fact that there is substantial evidence showing that contamination occurred off the premises, in her apartment, and indeed this evidence jibes with the evidence that the apartment itself was substantially contaminated.
 
 
 72
 A good deal of evidence was offered which was designed to show that Kerr-McGee had a motive for intentionally exposing her to contamination. She was not popular in the plant among the loyal employees. This was due to the work that she was shown to have been engaged in, her evidence gathering activities, and her efforts to show that plutonium was escaping from the plant.
 
 
 73
 Following Silkwood's death, the autopsy revealed that the amount of plutonium within her body at the time of her death was between 25% and 50% of the permissible lifetime body burden allowed by the AEC for plutonium workers. From her body condition and from the contamination that was found in her apartment, together with the evidence of her personal contamination, the logical inference is that the contamination took place outside the plant.
 
 
 74
 Defendants' theory of the case was, of course, that all of the contamination originated on the premises of the company. On the other hand, the plaintiff's theory of the case was that all exposure originated in Silkwood's apartment. The evidence is susceptible to either conclusion. In the face of such conflicting evidence, the question should go to the jury (as Kerr-McGee has requested alternatively). It was error for the majority to ignore the disputed facts and to hold that all the inferences favored the conclusion that contamination had been suffered on the premises of Kerr-McGee. Submission to a jury of twelve would have been the fair and conclusive way to solve this conflict.
 
 II
 Allowance of Property Damages
 
 75
 In allowing the award of property damages to the plaintiffs, the majority distinguishes between personal injury, which it holds to be subject to workers' compensation, and property damage, which is not so recoverable. Kerr-McGee argues, however, that its substantial compliance with preemptive federal regulations is conclusive evidence of due care and precludes recovery under a strict liability standard applicable to a private civil action. The fact that the federal government did not find fault on Kerr-McGee's part does not provide full and pervasive immunity.
 
 
 76
 The $5,000 property damage award, is not regarded by the majority as a remedy which would significantly interfere with federal regulations of Kerr-McGee's plant. I agree.
 
 
 77
 Furthermore, the majority says that the AEC has not been authorized to a provide compensatory award for property or other losses to a victim of a nuclear injury unless the injury falls within the Price-Anderson Act, which is intended to compensate victims of a widespread nuclear catastrophe. In further discussion, the majority notes that the Supreme Court, and Congress also, have recognized that state tort law principles continue to be applicable to some extent in off-site damage cases. In Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Supreme Court noted that the right to utilize common-law remedies "at least with regard to nuclear accidents was replaced by the compensation mechanism of the statute." 438 U.S. at 88, n. 33, 98 S.Ct. at 2638 n. 33. This statement clearly implies that such remedies remain intact in cases which do not involve a nuclear accident.
 
 
 78
 In enacting the Price-Anderson Act, 71 Stat. 576 (1957), 42 U.S.C., Congress sought to address the problem likely to result from nuclear disasters which might deter the industrial development of nuclear energy. The Act requires nuclear energy companies to take out insurance in order to protect against these extraordinary nuclear occurrences. In respect to nuclear incidents below the level of the extraordinary cases, i.e., cases like the present controversy which is conceded to be a lesser incident, private tort actions arising under state common law are to be used. Indeed, the congressional commentary expresses this interest.
 
 
 79
 The majority also concedes that strict liability is a theory which is to be pursued in this area, and that Oklahoma would apply strict liability to the escape of plutonium, a highly toxic and dangerous substance. Young v. Darter, 363 P.2d 829 (Okl.1961) (herbicide spray); Kirkland v. General Motors Corp., 521 P.2d 1353 (Okl.1974). Thus, the majority recognizes that nuclear energy is an area in which no court is likely to refuse to recognize the applicability of strict liability. Restatement of Torts, Second, § 520, Comment g (1977). The very essence of liability without fault is, of course, the carrying on of ultrahazardous activity, that which exposes to an abnormal risk. In conducting this kind of activity, it is foreseeable that serious injury will occur irrespective of fault. The risk is of such great magnitude that the activity is ultrahazardous, such that the person carrying on the activity is liable regardless of fault.
 
 
 80
 This then was the rationale of the majority for affirming the award of $5,000 property damages. As noted at the outset, we do not dispute this conclusion.
 
 
 81
 The jury also found that Silkwood did not intentionally or wilfully remove plutonium from the plant. All of the plutonium was conceded to have originated on the Kerr-McGee premises.
 
 III
 
 82
 Does the Atomic Energy Act of 1954 Impliedly Preempt That
 
 
 83
 Part of the State Remedy Which Authorizes Punitive Damages?
 
 
 84
 It is recognized in the majority opinion that nowhere in the Price-Anderson Act is there any mention of punitive damages. It is admitted, however, that mention in the Price-Anderson Act that state law may determine tort liability is susceptible to being read to permit punitive as well as compensatory damages in states like Oklahoma which permit them. The opinion considers important the fact that with regard to extraordinary nuclear occurrences (governed by Price-Anderson), provision is made for compensatory damages only. But we are not here dealing with that kind of a catastrophe nor with the Price-Anderson Act. Hence, the silence of the Price-Anderson Act is not probative. The question here is whether the Atomic Energy Act, 42 U.S.C. § 2011, et seq., as construed in Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir. 1971), aff'd Mem., 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), impliedly preempts part of the Oklahoma common law remedy.
 
 
 85
 The state was precluded as a result of the decision in Northern States Power Co. from undertaking the scheme of regulation of atomic energy which was then being carried out by the N.R.C. pursuant to the Atomic Energy Act. It is one thing to preempt the area which the federal government has undertaken to license and regulate; it is another for a court to read into the Act an intent to preempt a form of damages which would otherwise be a part of an isolated private lawsuit. This conclusion is particularly apt where no evidence exists either on the face of the Act or otherwise of an implied purpose to so preempt by the Congress.[1] Indeed, the fact that private lawsuits are tolerated without any limitations argues against the majority position.
 
 
 86
 The general approach to preemption of state authority is shown in Constitutional Law Cases and Materials by Professor Gerald Gunther, athed. (1975). Professor Gunther states:
 
 
 87
 When Congress exercises a granted power the federal legislation may displace state law under the supremacy clause of Article VI. But Congress does not typically act on a wholesale basis, and congressional entry into a field does not necessarily end all state authority. (emphasis added). Id. at 357.
 
 
 88
 What the author is saying is that preemption is not readily implied. Hart and Wechsler, The Federal Courts and the Federal System, 2nd ed. (1973) is cited as being in accord with this position. The authors state at pp. 470-471:
 
 
 89
 Federal law is generally interstitial in nature. It rarely occupies a legal field completely * * *. Federal legislation, on the whole, has been conceived and drafted on an ad hoc basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total corpus juris of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation.
 
 
 90
 Professor Gunther points out that the problem is one of statutory interpretation. He further states that:
 
 
 91
 (S)tate regulation falls not because of the commerce clause but because, under the supremacy clause of Art. VI, the "supreme" congressional law supersedes state law. Constitutional Law at 357.
 
 He goes on to say that:
 
 92
 (P)reemption occurs not only when there is an outright conflict between the federal scheme and the state requirement. State authority is barred as well when congressional action is an implicit barrier: when state regulation would interfere unduly with the accomplishment of congressional objectives. Determination of congressional requirements and purposes must start of course with the congressional statute itself, and the cases accordingly require a particularized examination of the specific regulatory scheme. Id.
 
 
 93
 In this case, unlike the other preemption cases, there are no competing regulatory schemes.
 
 
 94
 There is a shortage of case authority which even considers the issue as to whether a civil action or some phase of it (as in this case) is subject to preemption under Article VI of the Constitution. Our search has uncovered a few decisions which have involved state suits. None of these have accepted preemption as being the dispositive formula.[2]
 
 
 95
 The Eighth Circuit's opinion in Northern States Power Co. (affirmed by the Supreme Court) is a very sound opinion. By showing how the doctrine of preemption operates, it provides a contrast to this case and shows the inadequacy of the preemption showing here.
 
 
 96
 The Supreme Court's decision in Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) has some relevance in that it shows reluctance to exercise preemption. There a California statute
 
 
 97
 barred avocados which did not meet the state's minimum oil content standard of maturity. Federal marketing orders issued pursuant to the Agricultural Adjustment Act gauged the maturity of Florida avocados by standards other than oil content.
 
 
 98
 Thus, the state was seeking to regulate the same subject matter which federal regulations addressed in seeking to solve the same problem. Notwithstanding the conflict the Supreme Court held:
 
 
 99
 that the supremacy clause did not prohibit California from excluding Florida avocados certified as mature under the federal regulations but which contained less than the minimum California oil content.
 
 
 100
 The majority opinion concluded that there was not an actual conflict between the two schemes of regulation and that both could live, one with the other. It was said in that case that there was no evidence of a congressional design to preempt the field; that there was no physical impossibility in complying with both standards. The maturity of avocados seemed to be an inherently unlikely candidate for exclusive federal regulation; the federal regulation there in issue which set minimum standards for agricultural commodities, even though comprehensive, did not in and of itself show implied displacement of state control over distribution and sale of those commodities in the interest of the consumers of the commodities within the state. The opinion finally said that the Court was unable to find an unambiguous congressional mandate to exclude state regulation. The federal law involved concerned minimum rather than uniform standards. The statutory scheme was one of regulating maturity, and was drafted and administered locally by the growers' own representatives and was designed to do more than promote orderly competition among the South Florida growers. The dissenting opinion saw the federal scheme as a comprehensive regulatory program and the California scheme as identical in structure to the federal one. They said that the question was purely an economic one.
 
 
 101
 Why is the Florida Lime and Avocado Growers case helpful here? It shows the Supreme Court's tendency to refrain from declaring implied preemption whereby a state law is displaced by a federal one.
 
 
 102
 All of the decided cases tend to reveal the inherent weakness on the preemption question of the majority position. A holding that preemption is present here is a gross infringement of state prerogatives as well as the rights of individual citizens.
 
 
 103
 In the case before us, neither express preemption nor implied preemption is appropriate. Nor does the fact situation as a whole suggest applicability of the preemption doctrine. The simple reason is that it is not needed and would be superfluous.
 
 IV
 
 104
 The Lack of Authoritative Cases in Support of Preemption as
 
 Here Presented
 
 105
 The majority seeks to support its preemption of punitive damages position with the decision in Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir.), aff'd mem. 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). It also cites Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), but does not emphasize that case. The majority opinion states that: "Imposing a state tort law rule of strict liability for nuclear-related property damage * * * might in some instances encroach upon federal regulations setting effluent or other standards." Thus, it "might" encroach in some instances.
 
 
 106
 The above does not say that it does encroach. It merely speaks of possible encroachment; the majority does not say that encroachment is present. The majority concludes that imposition of tort liability in this case will significantly interfere with federal regulation. This latter conclusion suggests that preemption is to be decided on a case to case basis. Clearly it is not. The federal government has either preempted or it has not.
 
 
 107
 So far the majority is speaking of tort liability. It now turns to exemplary damages.
 
 
 108
 From the Northern States holding that the field of licensing and regulation has been preempted, it is contended that exemplary damages, due to their punishment aspect, cannot be awarded. But a tort action is a far cry from a regulatory system. The fact that Minnesota is precluded from this governmental activity falls short of dictating that exemplary damages have to be barred.
 
 
 109
 If a tort action does not interfere, the award of exemplary damages cannot impede federal government regulation. After all, the award of a large amount of actual damages can be equally punishing. It is the money which causes the suffering, not the designation.
 
 
 110
 The Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2284, preempts the field of nuclear licensing and regulation. But until now, no effort has been made to abolish damages in a private civil action. No collision exists nor is one possible between the simple state law inspired tort action and the federal government. To say that preemption prevents the imposition of exemplary damages in connection with a civil judgment carries the preemption concept far beyond anything that could have been intended or could ever be implied. The decision in the Northern States case was, as conceded by the majority, that Minnesota could not impose state licensing and regulation on Minnesota power plants in the face of a similar federal regulation scheme. This is unquestioned preemption.
 
 
 111
 Also in Northern States, it was made clear from a study of the congressional history that the intent of the Act was to preempt regulatory licensing authority. It was the licensing and regulation of more dangerous activities which was preempted by the federal government. The Joint Report of the Congress declared that it was intended to leave no room for the exercise of dual or current jurisdiction by states to control radiation hazards by regulating by-product source or special nuclear materials. 447 F.2d at 1151.
 
 
 112
 The intent is to have the material regulated and licensed either by the Commission, or by the state and local governments, but not by both. The bill is intended to encourage states to increase their knowledge and capacities and to enter into agreements to assume regulatory responsibilities over such materials.
 
 
 113
 Thus, it was special hazards which the federal government retained for its responsibility. These included the construction and operation of production utilization facilities, including reactors. It was pointed out that:
 
 
 114
 Subsection k provides that nothing in the new section 274 shall be construed to affect the authority of any state or local agency to regulate activities for purposes other than protection against radiation hazards. This subsection is intended to make it clear that the bill does not impair the state authority to regulate activities of AEC licensees for the manifold health, safety and economic purposes other than radiation protection. As indicated elsewhere, the Commission has exclusive authority to regulate for protection against radiation hazards until such time as the state enters into an agreement with the Commission to assume such responsibility.
 
 
 115
 The analysis by the Northern court brings out the concern of the Congress as to possible dual federal-state control, a concern which could not exist here.
 
 
 116
 In closing, I have some views regarding the large amount of the exemplary damages awarded by the jury. However, there is no need to consider this problem here at this time since the amount of reduction is not an issue. At the present writing, at least, the cause appears to be a lost one.
 
 
 117
 Finally, it is helpful to review some of the governing criteria. These are summarized by the Supreme Court in Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The state law there at issue required that certain aliens register as such and carry a card. The Supreme Court held that the subject of registration of aliens, because of its national and international nature, was preempted by the national government and that the power of the state was not concurrent.
 
 The Court said in speaking of a formula:
 
 118
 There is not-and from the very nature of the problem there cannot be-any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. This court * * * has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. * * * In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances * * * Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Id. at 67, 61 S.Ct. at 404.
 
 
 119
 Applying the Supreme Court's test in Hines, the conclusion would certainly be that preemption does not apply in this case, nor do any of the other suggested expressions of Justice Black apply to our problem.
 
 
 120
 We conclude that there is no justification whatsoever based on precedent, history, policy or reason which justifies a holding that preemption applies to the present problem.
 
 
 
 [1]
 Civil Rights Act and federal constitutional claims were also asserted in the original petition. The trial court's dismissal of those claims was affirmed in a separate appeal. Silkwood v. Kerr-McGee Corp., 637 F.2d 743 (10th Cir. 1980), cert. denied, --- U.S. ----, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981)
 
 
 [2]
 Silkwood told AEC investigators that she believed the contamination measured on the 7th resulted from inadequate decontamination at work the day before. If this were true, it proves only that the contamination of the 7th was job-related. Furthermore, her statement about being contaminated while preparing her urine sample on the morning of the 7th, although not admitted to prove the truth of the statement, is consistent with the only reasonable inferences that can be drawn from the balance of the evidence
 
 
 [3]
 There was evidence that a substantial amount of Kerr-McGee plutonium was missing from the job site but no evidence, circumstantial or otherwise, connects Silkwood with that material
 
 
 [1]
 The fact that Congress has expressly excepted the private tort action without restriction argues against any implied intent to preempt a part of such action
 
 
 [2]
 Bramer v. United States, 595 F.2d 1141 (9th Cir. 1979), a tort claims action by a serviceman for a radiation related injury. The Ninth Circuit found that preemption was not an issue except where Congress had expressly or impliedly provided for the supremacy of federal law. Id. at 1144, n. 7
 Rogers v. Ray Gardner Flying Service, Inc., 435 F.2d 1389 (5th Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1255, 28 L.Ed.2d 546 (1971), was a wrongful death action arising out of a private airplane crash in Oklahoma. The Fifth Circuit ruled that a Federal Aviation Act agency provision did not preempt an Oklahoma bailment law. Congress held not to have expressly preempted the field; tort law said to have been historically left to the states. Id. at 1393-94. Oklahoma law found to preclude liability (on other grounds).
 In Smith v. Cessna Aircraft Corp., 428 F.Supp. 1285 (N.D.Ill.1977), no preemption by federal law of state law in a plane crash case. Illinois had held that federal contribution laws preempted state law in a major aircrash case because of "the predominant, indeed almost exclusive, interest of the federal government in regulating affairs of the nation's airways." The court recognized that there was considerable congressional "opposition to interference with traditional state tort law." 428 F.Supp. at 1287. It was concluded that the case presented no necessity for preemption by federal law.
 Southern Pacific Transportation Co. v. United States, 462 F.Supp. 1193 (E.D.Cal.1978), a railroad suit against the United States for damages caused by a shipment of bombs. The railroad urged that state law was preempted because of federal regulations pertaining to the shipment of bulked goods on railroads. Held: no preemption, since many ICC regulations cited by the railroad had little or nothing to do with the accident. 462 F.Supp. 1223-27.
 Harper and Row Publishers, Inc. v. Nation Enterprises, 501 F.Supp. 848 (S.D.N.Y.1980) was a copyright action. The court found there that the plaintiff's state law claims were preempted by the federal Copyright Act. The case is noteworthy because it emphasizes the importance of a specific express declaration of preemption by Congress.